Stacey D. Adams (2959336)
Tyler A. Sims (5446448)
LITTLER MENDELSON, P.C.
900 Third Avenue, 8th Floor
New York, New York 10022
Telephone: (212) 583-9600
*Attorneys for Plaintiff*
    *Creative Circle, LLC*

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| CREATIVE CIRCLE, LLC, | Civil Action No. |
| Plaintiff, | |
| -against- | **VERIFIED COMPLAINT** |
| SUSAN NORELLE-BORTONE; 24 SEVEN, INC.; LAURA ROOKER; DAVID DiBELLA; and DANIELLE KENNY, | |
| Defendants. | |

Plaintiff Creative Circle, LLC ("Plaintiff" or "Creative Circle"), by and through its counsel, Littler Mendelson, P.C., by way of Verified Complaint against Defendants Susan Norelle Bortone, 24 Seven, Inc., Laura Rooker, David DiBella and Danielle Kenny (collectively, "Defendants"), hereby alleges as follows:

## PRELIMINARY STATEMENT

1.      This is an action brought by Creative Circle for injunctive and legal relief to enforce post-employment restrictive covenants against its former employee Defendant Susan Norelle-Bortone ("Bortone"), to prevent Bortone and her new employer 24 Seven, Inc. ("24 Seven") from unfairly competing, misappropriating its confidential information and tortiously

interfering with its business, and to enjoin the malicious and deliberate raiding of Creative Circle's employees by a direct competitor, 24 Seven, and its recruiters, Laura Rooker, David DiBella and Danielle Kenny.

2.     Creative Circle is a staffing agency that concentrates on placing professionals in the creative field.  24 Seven is a direct competitor in this highly specialized area of staffing and recruiting.

3.     Creative Circle gave Bortone her start in the staffing industry, trained her extensively to be successful in the business, promoted her several times, paid her hundreds of thousands of dollars and provided her with access to key employees, customers and confidential information.   In exchange, Bortone signed an agreement at the commencement of her employment that restricted her ability to compete within a narrowly defined geographic area for a finite period of time, prohibited her from soliciting Creative Circle's clients, employees and candidates and prevented her from using Creative Circle's trade secrets and confidential information in the event her employment terminated for any reason.   Bortone repeatedly reaffirmed these commitments over the years as she moved into more senior roles.

4.     Despite her success at Creative Circle, Bortone resigned effective July 16, 2018 and notified Creative Circle of her intent to join rival staffing company, 24 Seven, effective August 6, 2018.  Creative Circle immediately informed her that to do so would be a direct violation of the restrictive covenants in her agreement.  She attempted to avoid her restrictions by claiming that she was moving into a non-sales role at 24 Seven, by promising not to solicit Creative Circle's clients or candidates and by committing not to disclose any confidential information.  Creative Circle advised her that the prospective employment nevertheless violated the terms of her agreement, that she could not lawfully work for 24 Seven and that it intended to enforce her restrictions.  Moreover, for the reasons set forth herein, Creative Circle had good

2

reason to believe that Bortone's representations as to the nature of her position at 24 Seven were not truthful, and that she would indeed be directly competing with Creative Circle.

5.　　24 Seven was aware of Bortone's contractual obligations at the time it recruited her, and nevertheless induced her to violate her contract.　Indeed, 24 Seven had intimate knowledge of Creative Circle's business, because its majority investor, Morgan Stanley Capital Partners ("MSCP"), previously owned Creative Circle and sold it to On Assignment, Inc. (Creative Circle's parent company, now known as ASGN Incorporated, a publicly traded company) in June 2015.　Thus, 24 Seven knew Bortone was a key employee and knew full well the damage that would be caused to Creative Circle if it lost her to a direct competitor.

6.　　Bortone's resignation announcement triggered Creative Circle to look closely at whether 24 Seven was unlawfully soliciting its employees.　What it discovered was astounding – a deliberate and targeted campaign by 24 Seven to poach Creative Circle's most valuable asset – its employees.　In fact, an email search revealed **hundreds** of directed solicitations of Creative Circle employees by 24 Seven and its recruiters, including without limitation Defendants Laura Rooker, David DiBella and Danielle Kenny (together, the "Recruiters").　These individuals were operating under a directive to deliberately target and hire Creative Circle employees because it would be the quickest way to grow 24 Seven, divert business away from Creative Circle and to 24 Seven and grow 24 Seven's profits.　Both 24 Seven and its Recruiters were well aware that the employees they were soliciting had contracts – they just did not care.

7.　　Accordingly, Creative Circle brings this action to enjoin Bortone from violating her contractual obligations including (i) barring her from working for 24 Seven within a 50 mile radius of Creative Circle's New York office; (ii) prohibiting her from soliciting Creative Circle's customers, employees and candidates; and (iii) directing her to return any of Creative Circle's confidential and proprietary information.　It further seeks to enjoin 24 Seven and its Recruiters

from continuing its predatory practices with respect to soliciting Creative Circle's employees or in any other way interfering with the employment agreements between Creative Circle and its employees.

## THE PARTIES

8.      Creative Circle is a specialized staffing agency that concentrates on placing advertising, marketing, creative, digital and interactive professionals with companies on a full-time or freelance basis.   Creative Circle is incorporated in Delaware, has its corporate headquarters in California and has offices throughout the United States, including the New York City office where Bortone was employed located at 420 Lexington Avenue, Suite 2220, New York, New York 10170.

9.      24 Seven is also a specialized staffing company that offers temporary, temporary-to-hire, direct hire, and executive search services to various creative industries, including fashion, retail, marketing, advertising, interactive/digital, e-commerce, design, beauty, events, and sports/lifestyle.  24 Seven is incorporated in Delaware and its corporate offices are located in New York City.

10.     24 Seven is a direct competitor of Creative Circle.

11.     At the time of her resignation, Bortone worked as a Lead Account Executive in Creative Circle's New York City location.  Upon information and belief, Bortone resides at 44 Afterglow Avenue, Verona, NJ, 07044.

12.     Laura Rooker works for 24 Seven at its New York City location as a Lead Generation Specialist.

13.     David DiBella works for 24 Seven at its New York City location as a Corporate Recruiter.

14.     Danielle Kenny works for 24 Seven at its New York City location as a Corporate Recruiter.

## JURISDICTION AND VENUE

15.     This Court has original jurisdiction under 28 U.S.C. § 1331 based upon Federal Question because one of the claims asserted in this case is brought under the Federal Defend Trade Secrets Act ("DTSA"), 18 U.S.C. § 1836, *et seq.*.

16.     This Court has supplemental jurisdiction over the remaining claims pursuant to 28 U.S.C. § 1336 because all claims are related and form part of the same case and controversy.

17.     Venue is proper in the Southern District of New York under 28 U.S.C. § 1391(b)(2) because a substantial part of the acts or omissions giving rise to this proceeding occurred in this jurisdiction.  Namely, Bortone worked for Creative Circle in New York City, and is now currently working for 24 Seven in New York City.   Creative Circle maintains an office in New York City and all three of the Recruiters work at that location.

## FACTUAL ALLEGATIONS

A.     **Creative Circle**

18.     Creative Circle is a specialized staffing agency that concentrates on placing advertising, marketing, creative, digital and interactive professionals with companies on a full-time or freelance basis.

19.     On or about June 5, 2015, On Assignment, Inc.  ("ASGN") purchased Creative Circle from MSCP for $600,000,000.  MSCP was the majority owner/investor in Creative Circle and profited greatly from the sale.

20.     Prior to the sale, MSCP was thoroughly involved in Creative Circle's business and operations.  As an owner of the business, MSCP had access to Creative Circle's confidential information and knew all of the key employees – including the top managers, recruiters and sales

people (known as Account Executives).  It was also well aware that most Creative Circle employees are required to execute a Confidentiality, Non-Solicitation and Non-Competition Agreement.

21.    The purchase agreement between On Assignment and MSCP contained a non-solicitation provision that prohibited MSCP, for a period of three years, from soliciting any employees or interfering in any manner with Creative Circle's relationships with its customers, clients, vendors, suppliers, lenders or lessors.  That provision expired on June 5, 2018.

22.    Despite the above, on October 16, 2016 – before the expiration of the non-solicitation provision – MSCP announced its investment in 24 Seven, a rival staffing company engaged in the same business as Creative Circle.  In the press announcement, MSCP stated it would be "partnering" with and "supporting" the management team at 24 Seven in "implementing targeted strategic initiatives to supplement the company's successful track record… to build 24 Seven into one of the nation's leading staffing platforms."  The press release specifically references MSCP's prior investment in Creative Circle.  A true and correct copy of the press release is attached as Exhibit J.

23.    Following the purchase, the directive from MSCP to 24 Seven was to go after Creative Circle's employees.  They made it clear to 24 Seven that, if the Company wanted to be successful, it needed Creative Circle's employees.  MSCP knew Creative Circle was one of the most successful staffing companies in the industry, had made a huge profit when it sold Creative Circle to ASGN, and was now looking to emulate Creative Circle's business model in order to turn a profit with its new investment, 24 Seven.

**B.    Bortone's Employment with Creative Circle**

24.    Bortone was hired by Creative Circle as a Recruiter on July 10, 2006.  At the time, she had no previous experience in the staffing business.  Bortone's responsibilities as a

Recruiter focused on developing and maintaining a pool of available candidates to fill job orders for Creative Circle's clients. Recruiters also worked with Account Executives and the City Manager to develop new business and expand existing accounts for temporary, freelance and direct hire placements. Recruiters are provided with access to Creative Circle's proprietary database in their assigned office/region to locate viable candidates.

25.     At the commencement of her employment, Bortone signed an "At Will Employment Agreement." Among other things, that Agreement contained a non-disclosure provision, a non-competition provision that prevented Bortone from working for a competitor within a 250 mile radius for a period of twenty-four (24) months after her employment terminated, and a non-solicitation provision that prevented her from soliciting or communicating with Creative Circle's customers or candidates during the same twenty-four month period.

26.     On April 8, 2009, Bortone signed a new Employment Agreement with Creative Circle. Like her previous Agreement, the new Employment Agreement contained provisions requiring Bortone not to use Creative Circle's confidential information, prohibiting Bortone from working for a competitor for a period of 12 months in any geographic location where Creative Circle was located (with a specific focus on New York County), prohibiting Bortone from soliciting any of Creative Circle's customers or candidates and barring Bortone from soliciting or raiding Creative Circle's employees for a period of 18 months.

27.     Bortone was transferred to the position of Account Executive effective June 18, 2008. As an Account Executive, Bortone worked much more closely with Creative Circle's clients, and was responsible for generating revenue and sales by bringing in new clients, growing relationships with existing clients, obtaining job orders from clients for candidate placement, negotiating pay rates with clients, obtaining contracts with clients and addressing client service issues. Account Executives maintain frequent contact with established or potential clients to

7

develop relationships and determine opportunities for business expansion.  To build good will with Creative Circle's current and prospective clients, they are expected to maintain constant contact with these clients, through in-person visits (at least 5 per week), client entertainment (networking events, lunches, dinners, etc.) and regular telephone communication.

28.     Bortone was highly successful as an Account Executive.  As a result, on February 7, 2011 she was promoted to the position of Senior Account Executive.

29.     Bortone continued her high level of success and was one of Creative's top Senior Account Executives.  As a result, she was again promoted to Lead Account Executive on January 11, 2016.  As a Lead Account Executive, Bortone's job duties included all of her job duties as an Account Executive plus some additional management level responsibilities including conducting regular meetings with the Account Executives in the office, goal-setting, spearheading office initiatives, interviewing new hires, providing contract guidance and coaching/training producers (Account Executives and Recruiters).  As a Lead Account Executive, Bortone served as the second in command to the Sales Manager of the New York City office.  She also trained Creative Circle employees including new hires and her sales team including one-on-one training, training them on how to properly conduct client visits through direct attendance and mock visits, and role play.  Bortone also created "Creative Circle University" a training program she just recently rolled out for new hires and mid-level Account Executives.

30.     Following the acquisition of Creative Circle by On Assignment, and in connection with a grant of Restricted Stock Units, Bortone entered into a new Confidentiality, Non-Solicitation and Non-Competition Agreement with Creative Circle on June 30, 2015 (the "Agreement").  This is Bortone's most recent agreement and is the one that is binding on Bortone and which Creative Circle seeks to enforce in this action.  A true and correct copy of the June 30, 2015 Agreement is attached hereto as Exhibit A.

31.     Creative Circle invested a substantial amount of time, effort and money in training Bortone so she could learn about this highly specialized business, succeed at her job and successfully place professionals with new and existing clients of Creative Circle. Bortone received both formal and informal training from Creative Circle.  Her formal training included: sending her to leadership training; sending her to specialized three day lead training in Chicago at the time she was promoted; and sending her to multi-day city manager meetings on multiple occasions (which is when C suite, Senior Vice Presidents and training teams cover different topics critical to Creative Circle's business).  Informal training included shadowing more senior employees as she moved into more senior positions, ongoing coaching and mentoring by her managers and other senior and regional leaders.

32.     In addition to extensive training, Creative Circle also invested heavily in the financial support of Bortone so she could build her network.  This included covering the cost of networking events (at least one per month, possibly more) and paying for client lunches, dinners and other entertainment.

33.     It was this extensive training and financial support that led to Bortone's success and repeated promotions.  It also led to Bortone earning a significant amount of compensation while employed by Creative Circle.  Bortone's compensation consisted of a salary, commission and/or bonus payments and restricted stock grants.  In the years prior to her resignation Bortone earned the following:

- 2013 - $293,109

- 2014 - $284,171

- 2015 - $559,152[1]

---

[1]  This amount is particularly significant because Bortone was on maternity leave from February 2, 2015 through May 7, 2015, which means she actually only worked 9 months.

- 2016 - $246,700[2]

- 2017 - $224,120[3]

- 2018 (through June) - $90,588[4]

34.     In addition to the above compensation, Bortone also received restricted stock units worth tens of thousands of dollars in ASGN, the publicly-traded parent company of Creative Circle.

## C.     Creative Circle Entrusted Bortone with its Proprietary and Confidential Information

35.     More than anything else, the staffing industry is a business about people.  The success of a staffing company is directly dependent upon the good will and relationships it builds with its clients and with the candidates it places with clients.  These relationships are cultivated over years and Creative Circle's employees are the key to building and maintaining these relationships and good will.

36.     Over the years and at significant expense, Creative Circle has cultivated enduring relationships with its clients.  By virtue of her job duties, Bortone was provided access to confidential information about Creative Circles' clients and prospective clients and their staffing needs.   Creative Circle maintains a password-protected database that contains competitively sensitive information about those clients and prospective clients, such as: the identity and contact information for their key decision-makers and actual buyers of Creative Circles' services; client preferences; a history of the previous needs (job orders) fulfilled by

---

[2]  Bortone took a two month sabbatical in 2016 and thus only worked 10 months in 2016.

[3]  Bortone was on maternity leave from October 9, 2017 through February 5, 2018.  Thus she only worked 9 months in 2017.

[4]  Plaintiff was on maternity leave until February 5, 2018 and thus only worked four months in 2018 before resigning.

Creative Circle; the identities, resumes, portfolios, desired salaries and contact information of the job-seekers that have been placed there; pricing information and information about current and projected staffing needs; and a history of the sales calls, client visits and correspondence with those clients. None of this information is publicly available or easily ascertainable, and would be extremely valuable in the hands of a competitor.

37.     Given her senior position and tenure with Creative Circle, , Bortone had access to Creative Circle's entire database.

38.     In connection with her employment with Creative Circle, Bortone spent a large amount of her time and effort developing relationships and building good will with Creative Circle's clients. These client relationships are one of the most critical aspects of Creative Circle's business, and are essential to successfully making placements.

**D.      Bortone's Confidentiality, Non-Solicitation and Non-Compete Agreement**

39.     To protect ASGN's $600,000,000 investment in Creative Circle, and to insure the protection of Creative Circle's confidential and proprietary information, the good will Creative Circle had built with its employees and its investment in the employees it trained and financially supported, following the acquisition of Creative Circle by ASGN, Creative Circle employees were required to sign updated Confidentiality, Non-Solicitation and Non-Competition Agreements. Bortone signed her Agreement on June 30, 2015.

40.     Section 1.0 of the Agreement prevents Bortone from using or disclosing any of Creative Circle's Confidential Information to any person or entity, both during and after her employment. The Agreement specifically defines Confidential Information as including:

> [A]ny and all information whether written or verbal, or contained on computer hardware or software, disk, tape, microfiche or other media, whether or not meeting the legal definition of a trade secret, contain and/or concerning: (a) the Company's business plans, strategic plans, forecasts, budgets, sales, projections and costs; (b) the Company's personnel and payroll records, employee lists, prospective employee lists, employee

11

salaries, and contracts and wage information; (c) candidates, consultants, contractors, including lists, identities, resumes, preferences, transaction histories, rates and related information, or other characteristics; (d) the Company's customers and prospective customers, including their identity, the identities of their employees, contractors and consultants, special needs, job orders, preferences, transaction histories, contacts, other characteristics, agreements and prices; (e) marketing activities, plans, promotions, operations, research and development, advertising sources, the techniques used in, approaches to, or results of any market research or other marketing data; (f) business operations, internal structures and financial affairs; (g) systems and procedures, and methods of production; (h) pricing structure, pricing information (such as price lists, quotation guides, previous or outstanding quotations, or billing information); (i) proposed or pending projects, services and products; (j) contracts with other parties; (k) Company customer history and technical information; (l) information contained on CircleView and any other system that may replace it over time; (m) computer techniques and processing capabilities; (n) proprietary computer programs; (o) business plans and projections, including new product, facility or expansion plans; (p) estimating programs and methodology; and (q) training materials….

41.     Section 2.2 of the Agreement contains the following non-compete provision:

Employee agrees that, for a period of twelve (12) months after the termination of Employee's employment, Employee will not, directly or indirectly: (a) compete with the Company's Business or otherwise own, maintain, operate, engage in, assist, be employed by, or have any interest in any business engaging in or planning or preparing to be engaged in the Company's Business, within a fifty (50) mile radius of any office of the Company (i) as to which the Employee was assigned or (ii) over which Employee had supervisory, managerial or administrative responsibilities during the last twelve (12) months of his/her employment with the Company; or (b) accept employment with a Company customer to whom Employee provided any services on behalf of Company during the last twelve (12) months of his/her employment with the Company.

42.     Section 2.3 of the Agreement prohibits Bortone, for a period of twelve (12) months from the date of her resignation, from:

(i)      soliciting, seeking to employ or retaining the services of any employee of or independent contractor who worked for Creative Circle within the previous 12 months or in any way persuading or inducing any employee or independent contractor from leaving his/her employment with Creative Circle or to refrain from providing services to Creative Circle;

(ii)     soliciting or seeking to place any temporary employee or independent contractor candidate (together, "candidates") directly or indirectly placed or sought to be placed, by Bortone or whose identity Bortone learned while employed by Creative Circle, or persuading such candidates to alter or reduce their services  for Creative Circle; and

(iii)    soliciting or providing services to Creative Circle customers whom Bortone serviced or sought to service or whose identity Bortone learned while employed by Creative Circle, or persuading such customers to alter or reduce its use of services from Creative Circle.

43.     Section 2.5 of the  Agreement provides that, should Bortone violate any of the aforementioned restrictions, the 12 month restricted period shall be automatically extended by the period of time during which she is in violation.

44.     In Section 4.2 of the Agreement, Bortone acknowledged that the restrictions contained therein would not prevent her from earning a living, and were reasonable and necessary to protect Creative Circle's legitimate interests, good will and customer relationships.

45.     Section 6.2 of the Agreement provides Creative Circle with the right to seek temporary, preliminary and permanent injunctive relief, without the posting of a bond, to prevent violations of the Agreement, and further contains an acknowledgment that Creative Circle will be irreparably harmed should Bortone violate any of the restrictions contained in the Agreement.

46.     Section 6.3 of the Agreement provides that it "will be governed by the laws of the state in which [Bortone] last regularly worked for [Creative Circle]," which is the State of New York.

47.     Section 8.0 of the Agreement provides that, in the event Bortone breaches the Agreement, and Creative Circle is successful in any legal or equitable action against Bortone to enforce the terms of the Agreement, it shall be entitled to payment of all costs, expenses and reasonable attorneys' fees from Bortone.

13

48.     Significantly, in March 2016, the Honorable Richard Berman, U.S.D.J., issued a temporary restraining order enforcing a virtually identical Agreement against a former employee of Creative Circle, Daniel Ecker, who – like Bortone – went to work for a competitor in violation of his Agreement.  A true and correct copy of Judge Berman's Order, issued

E.     **Bortone's Resignation From Creative Circle**

49.     On July 2, 2018, Bortone submitted her letter of resignation to Creative Circle effective July 13, 2018.  A true and correct copy of Bortone's resignation letter is attached hereto as Exhibit B.

50.     In the resignation letter, Bortone notified Creative Circle that she had accepted a job as Senior Director of Training and Development at 24 Seven.

51.     Bortone was clearly aware that such employment would directly violate the restrictive covenants contained in her Agreement.  She therefore requested a waiver of her obligations in the Agreement and promised that she would not be working in a sales capacity, would not share any of Creative Circle's confidential information, would not solicit any of Creative Circle's candidates, clients or employees, share any contact information for any clients or candidates she has been in touch with over the past year at Creative Circle, disclose any contract terms for her Creative Circle clients, or discuss any confidential information provided by clients regarding their business.

52.     Significantly, in her resignation letter, Bortone acknowledged that, while employed at Creative Circle, she had access to Creative Circle's confidential information, including  "information in regards to data, financials (including office/company revenues, mark-ups, gross margins, bill rates, pay rates, hours, start or goals) metrics or other confidential information," "best practices, initiatives and upcoming initiatives," "contract terms," "confidential information shared by clients in regard to their business," and "contact information

14

of clients, candidates and employees – including names, titles, phone numbers or emails."  See Exhibit B.

53.     Creative Circle responded to Bortone on July 6, 2018 and advised her that, despite her assurances, the position at 24 Seven violated the post-employment restrictions in her Agreement and that it would not waive any of its rights under the Agreement.  A true and correct copy of Creative Circle's July 6, 2018 Letter, from Wendy Gerard, Esq., General Counsel, to Bortone is attached hereto as Exhibit C.

54.     On that same date, July 6, 2018, Creative Circle also sent a letter to 24 Seven advising them of Bortone's contractual obligations to Creative Circle, enclosing a copy of the Agreement and notifying them that Bortone's prospective employment would violate the Agreemeent. A true and correct copy of Creative Circle's July 6, 2018 Letter (without attachment) from Wendy Gerard, Esq., General Counsel, to Celeste Gudas, CEO and President of 24 Seven, is attached hereto as Exhibit D.

55.     Bortone responded to Creative Circle on July 9, 2018 and attempted to justify her actions by providing examples of how she was transitioning her accounts to other Creative Circle Account Executives.   A true and correct copy of Bortone's July 9, 2018 email response to Wendy Gerard, Esq. (without attachments) is attached hereto as Exhibit E.

56.     Creative Circle responded later that same day on July 9, 2018, and reiterated its position that it would not waive Bortone's obligations under the Agreement.  A true and correct copy of Wendy Gerard, Esq.'s July 9, 2018 email response to Bortone is attached hereto as Exhibit F.

57.     There are multiple reasons why the "assurances" provided by Bortone are unworthy of credence:

a.      First, working for 24 Seven *in any capacity* is a blatant violation of the Agremeent.  The non-compete provision in the Agremeent was not limited to just sales positions.

b.      Second, Bortone conveniently did not identify who she would purportedly be training in her position as a Senior Director of Training and Development.  However, given her extensive sales background while at Creative Circle, there is no question she will be "training" 24 Seven's sales people, account executives and recruiters.  These individuals directly compete with Creative Circle for business.  Accordingly, by training these individuals, Bortone is herself indirectly competing with Creative Circle.

c.      Third, Bortone was responsible for training Creative Circle employees.  Accordingly, even if she was legitimately moving into a training role (which is highly suspect), she was performing job duties similar to what she did for Creative Circle, and in direct competition with Creative Circle.

d.      Fourth, Creative Circle has good reason to believe that the training title 24 Seven created for Bortone is just a "front" and that she unquestionably was hired for her sales experience and client contacts.  As an initial matter, Bortone shared that 24 Seven would be paying her well in excess of $200,000 per year.  This is a salary commensurate with someone in a lead sales position or a management level position, not a training position.  In addition, while attempting to recruit another senior level Creative Circle employee, Emily Webber, to join 24 Seven, the recruiter advised Webber not to worry about her employment contract with Creative Circle because they would "create a training role" for her to circumvent the non-compete.  See Affidavit of Emily Webber ("Webber Aff.), ¶ 7.  Incredibly, the recruiter told Webber that the CEO and President of 24 Seven, Celeste Gudas, was aware of the non-compete agreements and was looking for ways "challenge and protect" Creative Circle employees from their non-

competes.  (Webber Aff., ¶ 12).  There can be no doubt then that the "training" role created for Bortone was a similar sham.

e.      Finally, Creative Circle is in possession of an email dated May 16, 2018 from David DiBella to Bortone recruiting her for a position at 24 Seven.  In that email, DiBella explicitly recruited Bortone to be a "director level business developer to take over a team and bring in business."  See Affidavit of Stacia Manion ("Manion Aff."), ¶ 5, Exh. A.  This recruiting email clearly contradicts the purported "training" position that Bortone claims she is taking.

58.      24 Seven separately responded to Creative Circle via letter dated July 10, 2018 virtually repeating what Bortone had said in her communications with Creative Circle about her new position – that she would be in a non-sales role and would not use any of Creative Circle's confidential information.  It wholly ignored the fact that Bortone's prospective employment nevertheless violated the non-compete provision in her Agreement.  A true and correct copy of Creative Circle's July 10, 2018  letter from Chief Counsel, Evan Lupion, Esq., to Wendy Gerard, Esq., is attached hereto as Exhibit G.  The responsive letter made it abundantly clear that Bortone and 24 Seven were collaborating to knowingly violate her Agreement.

59.      For the same reasons that Bortone's assurances did not adequately address Creative Circle's concerns (see Complaint ¶57), 24 Seven's letter also did not provide Creative Circle with any assurance that Bortone or 24 Seven intended to abide by the Agreement.  To that end, on July 20, 2018, Creative Circle responded to Lupion's letter, explaining that – even though Bortone was purportedly taking on a training role and would have no sales responsibility – her employment with 24 Seven in its New York City office nonetheless violated the terms of her Agreement.  Creative Circle explained that Bortone's non-compete was not dependent on position held and that, in any event, Bortone's duties at Creative Circle included training employees.  Accordingly, her employment by 24 Seven violated her Agreement.  Creative Circle

further reminded 24 Seven that the Agreement prevented Bortone not only from direct solicitations, but from indirect solicitations as well.  Creative Circle made it clear that, if 24 Seven nevertheless proceeded with employing Bortone, it would enforce its rights in Court.  A true and correct copy of Creative Circle's July 20, 2018 email from Wendy Gerard, Esq. to Evan Lupion, Esq. is attached hereto as Exhibit H.

**F.**     **Bortone's Violations of Her Agreement**

60.     Despite being cautioned several times by Creative Circle, Bortone nevertheless commenced her employment with 24 Seven on or about August 6, 2018.

61.     Upon information and belief, Bortone is using or inevitably will use or disclose Creative Circle's confidential and proprietary information.

62.     Bortone is either directly or indirectly competing with Creative Circle within the prohibited 50 mile radius and is directly or indirectly performing job duties substantially similar to that which she performed for Creative Circle.

63.     By training 24 Seven's employees, Bortone has been or will be indirectly soliciting clients with whom she did business on behalf of Creative Circle.

**G.**     **24 Seven's Raiding and Poaching of Creative Circle's Employees**

64.     24 Seven has been engaged in a prolific and deliberate attempt to raid Creative Circle's employees.  Bortone is just one such example, but there are many others.

65.     24 Seven and its Recruiters are specifically targeting key employees of Creative Circle, such as Bortone, who they know are the most successful employees.  24 Seven is targeting high level managers and lead account executives responsible for teams of employees and overall Company strategy, and employees who have significant client or candidate contacts and whose loss to Creative Circle would be devastating.  These key employees have built up a tremendous amount of good will with Creative Circle's customers and candidates and could

18

leverage their relationships and good will with these customers and candidates to bring them over to 24 Seven.  24 Seven and the Recruiters are also targeting teams of Account Executives and Recruiters around the nation in hopes of facilitating a mass exodus of employees from Creative Circle to 24 Seven.  There can be no doubt that, if 24 Seven and the Recruiters were to achieve their goals, and Creative Circle were to lose teams of employees on this large a scale, it would crush its business.

66.     For example, 24 Seven has repeatedly attempted to solicit Melissa Sanchez, Senior Vice President of Operations.  24 Seven has also tried to aggressively recruit Emily Webber, Regional Director of Operations for Creative Circle's Great Lakes Region.  See Webber Aff., *passim*.

67.     24 Seven know precisely who Creative Circle's most valuable employees are by virtue of its ownership by MSCP.  As a prior investor in Creative Circle, MSCP had intimate knowledge of Creative Circle's business and confidential information, which it shared with 24 Seven in order to unfairly compete.

68.     Indeed, 24 Seven is under a directive from MSCP to poach Creative Circle's employees in order to grow its own business and harm Creative Circle's business.  See Webber Affidavit, ¶ 13.

69.     More recently, 24 Seven has stepped up its unlawful campaign to raid Creative Circle's employees.

70.     Following the receipt of Bortone's resignation letter, Creative Circle conducted an email search and inquired of certain management employees to ascertain the extent to which 24 Seven was attempting to recruit its employees.

71.     Creative Circle was shocked by what it learned.  The email search yielded more than **400** email solicitations by 24 Seven recruiters to Creative Circle employees. Among others,

employees whom 24 Seven attempted to recruit included those in the roles of City Director, Senior Recruiter, and Senior Account Executive.  See Manion Aff., ¶ 4.

72.     Employees shared that they had been repeatedly and aggressively recruited by 24 Seven, and provided countless examples of solicitations via their work and personal email accounts, and through LinkedIn.  They advised that they have been continually contacted by Creative Circle's recruiters, even after telling them they were not interested and/or that they had contracts that would prohibit them from coming to work for Creative Circle.

73.     Creative Circle's employees were primarily solicited by Defendants Rooker, DiBella and Kenny.

74.     24 Seven and the Recruiters were well aware that the Creative Circle employees they were soliciting had contracts with Creative Circle that contained post-employment restrictions that would prevent them from working for Creative Circle.  Indeed, some of the employees who were solicited by 24 Seven specifically advised the Recruiters they had contracts.

75.     Indeed, one of 24 Seven's recruiters, specifically told Webber that 24 Seven knew Creative Circle employees had contracts and that 24 Seven had devised a strategy to "challenge and protect" employees from their non-compete agreements, including creating sham positions to disguise what the former Creative Circle employees would really be doing for 24 Seven, and that the President and CEO of 24 Seven had blessed this strategy.  (Webber Aff., ¶ 12).

76.     In addition, upon information and belief, 24 Seven advised Creative Circle employees who it solicited, including but not limited to Bortone, that it would protect them from any actions taken by Creative Circle to enforce their contracts, including providing them with legal defense and indemnifying them for any damages

77.     In an attempt to stop the vicious raiding campaign, Creative Circle sent letters to Creative Circle's Recruiters.   Creative Circle sent a letter to Rooker on August 3, 2018 demanding that she stop raiding its employees.  A true and correct copy of the August 3, 2018 letter to Rooker (without attachment) is attached hereto as Exhibit I.

78.     Creative Circle sent a letter to DiBella on August 3, 2018 demanding that she stop raiding its employees.  A true and correct copy of the August 3, 2018 letter to DiBella (without attachment) is attached hereto as Exhibit J.

79.     Creative Circle sent a letter to Kenny on August 3, 2018 demanding that she stop raiding its employees.  A true and correct copy of the August 3, 2018 letter to Kenny (without attachment) is attached hereto as Exhibit K.

80.     To date, none of the Recruiters have responded to the letter sent to them.

81.     Despite receiving the letters, 24 Seven and the Recruiters nevertheless continued their predatory practices and attempted to tortiously interfere with the contracts that Creative Circle had with its employees and Bortone nevertheless commenced her employment with Creative Circle on August 6, 2018.

### COUNT ONE
### BREACH OF CONTRACT
#### (As Against Bortone)

82.     Creative Circle repeats and realleges the allegations set forth above as if fully set forth and repeated herein.

83.     As demonstrated above, Bortone has breached the Agreement.

84.     The restrictive covenants contained in the Bortone's Agreement remain in full force and effect, and Bortone, for good consideration, remains obligated to comply with the restrictive covenants.

85.     Creative Circle has satisfied all of its obligations under the terms and conditions of the Agreement.

86.     Bortone's actions have damaged Creative Circle's good will and interfered with its legitimate business interests, have resulted or will result in the loss of business and the diversion of business from Creative Circle to Bortone's new employer 24 Seven, and have denied Creative Circle the benefit of its bargain under the Agreement.

87.     By virtue of Bortone's breach of her contractual obligations, Creative Circle has suffered and is continuously faced with immediate and irreparable injury.

88.     Creative Circle is likely to succeed on the merits of its claims.

89.     Creative Circle has no adequate remedy at law, and will suffer substantial and immediate irreparable harm unless Bortone is enjoined as requested below.

90.     Greater injury will be inflicted upon Creative Circle by the denial of this relief than will be inflicted on Bortone by the granting of such relief.

**WHEREFORE**, Creative Circle demands judgment against Bortone as follows:

a.      An order restraining and enjoining Bortone, for a period of 12 months from the date of her last violation, from working for 24 Seven at any location within a 50 mile radius of Creative Circle's New York City office or within a 50 mile radius of any Creative Circle office over which Bortone had supervisory, managerial or administrative responsibilities;

b.      An order restraining and enjoining Bortone, for a period of 12 months from the date of her last violation, from working for any staffing business that competes with Creative Circle (including but not limited to 24 Seven), or otherwise competing with Creative Circle's business, within a 50 mile

radius of Creative Circle's New York City office or within a 50 mile radius of any Creative Circle office over which Bortone had supervisory, managerial or administrative responsibilities;

c.      An order restraining and enjoining Bortone, for a period of 12 months from the date of her last violation, from directly or indirectly soliciting, seeking to employ or retaining the services of any employee or independent contractor who worked for Creative Circle within the previous 12 months;

d.      An order restraining and enjoining Bortone, for a period of 12 months from the date of her last violation, from directly or indirectly soliciting or seeking to place any temporary employee or independent contractor candidate whom Bortone had directly or indirectly placed or sought to place on behalf of Creative Circle, or whose identity Bortone learned while employed by Creative Circle, or from persuading such candidate to alter or reduce his/her services for Creative Circle;

e.      An order restraining and enjoining Bortone, for a period of 12 months from the date of her last violation, from directly or indirectly soliciting or providing services to Creative Circle customers whom Bortone serviced or sought to service on behalf of Creative Circle, or whose identity Bortone learned while employed by Creative Circle, or from persuading such customer to alter or reduce its use of services from Creative Circle;

f.      An order restraining and enjoining Bortone from using or disclosing any of Creative Circle's confidential, proprietary and trade secret information

23

and requiring Bortone to return any such information currently in her possession;

g.    Disgorgement of any profits, commissions or monies earned by Bortone as a result of her unlawful conduct;

h.    Compensatory, consequential and punitive damages;

i.    Prejudgment Interest;

j.    An award of attorneys' fees and costs; and

k.    Such further relief as the Court may deem just and equitable.

<div align="center">

**COUNT TWO**
**MISAPPROPRIATION AND CONVERSION OF TRADE SECRETS AND CONFIDENTIAL INFORMATION**
**(As Against Bortone and 24 Seven)**

</div>

91.    Creative Circle repeats and realleges the allegations set forth above as if fully set forth and repeated herein.

92.    By virtue of her employment at Creative Circle and performance of responsibilities for Creative Circle, Bortone was given access to Creative Circle's Confidential Information and Trade Secrets.

93.    Upon information and belief, Bortone and 24 Seven have engaged in the actual or threatened misappropriation and/or conversion of Creative Circle's Confidential Information and trade secrets, in violation of common law.

94.    The actions of Bortone and 24 Seven were intentional, willful, outrageous and malicious, and justify the imposition of exemplary damages.

95.    By virtue of the misappropriation and/or conversion by Bortone and 24 Seven of Creative Circle's Confidential Information, Creative Circle has suffered and is continuously faced with immediate and irreparable injury.

96.    Creative Circle is likely to succeed on the merits of its claims.

97.     Creative Circle has no adequate remedy at law, and will suffer substantial and immediate irreparable harm unless Bortone and 24 Seven are enjoined as requested below.

98.     Greater injury will be inflicted upon Creative Circle by the denial of this relief than will be inflicted on Bortone and 24 Seven by the granting of such relief.

**WHEREFORE**, Creative Circle demands judgment against Bortone and 24 Seven as follows:

  a.     An order restraining and enjoining Bortone and 24 Seven from using or disclosing any of Creative Circle's confidential, proprietary and trade secret information and requiring Bortone and 24 Seven to return any such information currently in their possession;

  b.     Disgorgement of any profits, commissions or monies earned by Bortone and/or 24 Seven as a result of their unlawful conduct;

  c.     Compensatory, consequential and punitive damages;

  d.     Prejudgment Interest;

  e.     An award of attorneys' fees and costs; and

  f.     Such further relief as the Court may deem just and equitable.

## COUNT THREE

**VIOLATION OF THE DEFEND TRADE SECRETS ACT (18 U.S.C. § 1836, *et seq*.)**
**(As Against Bortone and 24 Seven)**

99.     Creative Circle repeats and realleges the allegations set forth above as if fully set forth and repeated herein.

100.    The Defend Trade Secrets Act of 2016 ("DTSA") forbids threatened and actual misappropriation of trade secrets.

101.    The definition of trade secrets under the DTSA includes "all forms and types of financial, business, scientific, technical, economic, or engineering information including patterns, plans, compilations, program devices, formulas, designs, prototypes, methods, techniques, processes, procedures, programs, or codes, whether tangible or intangible, and whether or how stored, compiled, or memorialized physically, electronically, graphically, photographically, or in writing if (A) the owner thereof has taken reasonable measures to keep such information secret; and (B) the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information."

102.    Creative Circle's Confidential Information, as described in detail above, constitutes a trade secret within the meaning of the DTSA.

103.    Creative Circle took substantial measures to keep this information secret including, but not limited to, creating a secure and protected database that employees were granted access to only on a "need to know" basis and which was not available to the public, requiring employees to sign agreement guarding the confidentiality of its Confidential Information and creating policies to insure its Confidential Information was not disclosed or made public.

104.    By virtue of her employment at Creative Circle and performance of responsibilities for Creative Circle, Bortone, as well as the other employees who 24 Seven and the Recruiters solicited were given access to and possessed trade secrets within the meaning of the DTSA.

105.    24 Seven hired Bortone and is attempting to hire many other Creative Circle employees for the express purpose of gaining access to this Confidential Information.

106.   24 Seven is also using Confidential Information that it has unlawfully gained access to through its relationship with MSCP to specifically target key employees.  24 Seven would not know who these key employees are, or which employees are the most successful for Creative Circle, without having unlawfully misappropriated these trade secrets from Creative Circle.

107.   Upon information and belief, Bortone and 24 Seven have engaged in the actual or threatened misappropriation of Creative Circle's trade secrets, in violation of the DTSA.

108.   The actions of Bortone and 24 Seven were intentional, willful, outrageous and malicious, and justify the imposition of exemplary damages.

109.   By virtue of the misappropriation and threatened misappropriation by Bortone and 24 Seven, Creative Circle has suffered and is continuously faced with immediate and irreparable injury.

110.   Creative Circle is likely to succeed on the merits of its claims.

111.   Creative Circle has no adequate remedy at law, and will suffer substantial and immediate irreparable harm unless Bortone and 24 Seven are enjoined as requested below.

112.   Greater injury will be inflicted upon Creative Circle by the denial of this relief than will be inflicted on Bortone and 24 Seven by the granting of such relief.

**WHEREFORE**, Creative Circle demands judgment against Bortone and 24 Seven as follows:

a.   An order enjoining and restraining Bortone and 24 Seven from using or disclosing any of Creative Circle's confidential, proprietary and trade secret information and requiring Bortone and 24 Seven to return any such information currently in their possession;

27

b.      Disgorgement of any profits, commissions or monies earned by Bortone and 24 Seven as a result of their unlawful conduct;

c.      Compensatory, consequential and exemplary damages;

d.      Prejudgment Interest;

e.      An award of attorneys' fees and costs; and

f.      Such further relief as the Court may deem just and equitable.

**COUNT FOUR**
**UNJUST ENRICHMENT**
**(As Against Bortone and 24 Seven)**

113.    Creative Circle repeats and realleges the allegations set forth above as if fully set forth and repeated herein.

114.    By reason of their improper conduct and willful and wanton disregard of the rights and interests of Creative Circle, without any justification or excuse, Bortone and 24 Seven have diverted and/or may continue to divert business from Creative Circle's customers, candidates, and potential customers and candidates, that otherwise would have used Creative Circle for their staffing needs.

115.    It would be unjust, unfair and inequitable for Bortone and 24 Seven to retain the benefit they have received or will receive as a result of their illegal conduct.

116.    Bortone and 24 Seven should be enjoined from profiting as a result of their illegal conduct, required to disgorge any profits or commissions earned as a result of their unlawful conduct, and required to pay damages to Creative Circle.

117.    By virtue of Bortone and 24 Seven's illegal conduct, Creative Circle has suffered and is continuously faced with immediate and irreparable injury.

118.    Creative Circle is likely to succeed on the merits of its claims.

28

119.    Creative Circle has no adequate remedy at law, and will suffer substantial and immediate irreparable harm unless Bortone and 24 Seven are enjoined as requested below.

120.    Greater injury will be inflicted upon Creative Circle by the denial of this relief than will be inflicted on Bortone and 24 Seven by the granting of such relief.

**WHEREFORE**, Creative Circle demands judgment against Bortone and 24 Seven as follows:

a.    An order restraining and enjoining Bortone, for a period of 12 months from the date of her last violation, from working for 24 Seven at any location within a 50 mile radius of Creative Circle's New York City office or within a 50 mile radius of any Creative Circle office over which Bortone had supervisory, managerial or administrative responsibilities;

b.    An order restraining and enjoining Bortone, for a period of 12 months from the date of her last violation, from working for <u>any</u> staffing business that competes with Creative Circle (including but not limited to 24 Seven), or otherwise competing with Creative Circle's business, within a 50 mile radius of Creative Circle's New York City office or within a 50 mile radius of any Creative Circle office over which Bortone had supervisory, managerial or administrative responsibilities;

c.    An order restraining and enjoining Bortone, for a period of 12 months from the date of her last violation, from directly or indirectly soliciting, seeking to employ or retaining the services of any employee or independent contractor who worked for Creative Circle within the previous 12 months;

29

d.    An order restraining and enjoining Bortone, for a period of 12 months from the date of her last violation, from directly or indirectly soliciting or seeking to place any temporary employee or independent contractor candidate whom Bortone had directly or indirectly placed or sought to place on behalf of Creative Circle, or whose identity Bortone learned while employed by Creative Circle, or from persuading such candidate to alter or reduce his/her services for Creative Circle;

e.    An order restraining and enjoining Bortone, for a period of 12 months from the date of her last violation, from directly or indirectly soliciting or providing services to Creative Circle customers whom Bortone serviced or sought to service on behalf of Creative Circle, or whose identity Bortone learned while employed by Creative Circle, or from persuading such customer to alter or reduce its use of services from Creative Circle;

f.    An order restraining and enjoining Bortone and 24 Seven from using or disclosing any of Creative Circle's confidential, proprietary and trade secret information and requiring Bortone to return any such information currently in their possession;

g.    Disgorgement of any profits, commissions or monies earned by Bortone as a result of her unlawful conduct;

h.    Compensatory, consequential and punitive damages;

i.    Prejudgment Interest;

j.    An award of attorneys' fees and costs; and

k.    Such further relief as the Court may deem just and equitable.

**COUNT FIVE**

**UNFAIR COMPETITION**
**(As Against All Defendants )**

121.    Creative Circle repeats and realleges the allegations set forth above as if fully set forth and repeated herein.

122.    Throughout her employment with Creative Circle, Bortone gained access to critically important, unique and valuable Confidential Information.

123.    This information about Creative Circle's business, customers, candidates and employees was never available to Creative Circle's competitors or to the public at large, and Bortone and 24 Seven would not have had access to such information but for her employment with Creative Circle.

124.    24 Seven has improperly gained access to this Confidential Information through Bortone.

125.    24 Seven has also improperly gained access to Creative Circle's confidential information, including but not limited to the identities of its key employees, through MSCP. This information has been shared with the Recruiters and is now being used to target specific Creative Circle employees to come join 24 Seven.

126.    The objective of 24 Seven is to harm Creative Circle's business by diverting customers and candidates to 24 Seven through the unlawful poaching of those Creative Circle employees who hold all of the good will and Confidential Information about Creative Circle's customers and candidates.

127.    The actions of Defendants have fallen below the minimum standard of fair play and dealing acceptable in the commercial arena and thus constitute unfair competition.

128.    Defendants are enjoying or will enjoy the benefits of their unfair competition.

31

129.   Unless enjoined, Defendants will continue to misuse confidential information wrongfully obtained from Creative Circle to harm Creative Circle's business reputation, to divert a portion of Creative Circle's business to 24 Seven, and to gain an unfair competitive advantage for Defendants in the staffing industry.

130.   By reason of Defendants' acts of unfair competition, Creative Circle has sustained, and will sustain, loss of the value of its business, losses of revenue and other monetary damages in a presently indeterminable amount.

131.   Defendants have further unfairly competed with Creative Circle by using this information to cause injury to Creative Circle's good will and reputation amongst its clients, candidates and employees.

132.   Additionally, 24 Seven and the Recruiters have engaged in unfair competition by actively and maliciously targeting and raiding Creative Circle's employees (including over 400 targeted solicitations), in an effort to build 24 Seven's own business off the back of Creative Circle, divert business, customers, candidates and employees away from Creative Circle and deliberately harm the business of Creative Circle.

133.   By virtue of the foregoing unfair competition, Creative Circle has suffered and is continuously faced with immediate and irreparable injury.

134.   Creative Circle is likely to succeed on the merits of its claims.

135.   Creative Circle has no adequate remedy at law, and will suffer substantial and immediate irreparable harm unless Defendants are enjoined as requested below.

136.   Greater injury will be inflicted upon Creative Circle by the denial of this relief than will be inflicted on Defendants by the granting of such relief.

**WHEREFORE**, Creative Circle demands judgment against Defendants as follows:

a.     An order restraining and enjoining Bortone, for a period of 12 months from the date of her last violation, from working for 24 Seven at any location within a 50 mile radius of Creative Circle's New York City office or within a 50 mile radius of any Creative Circle office over which Bortone had supervisory, managerial or administrative responsibilities;

b.     An order restraining and enjoining Bortone, for a period of 12 months from the date of her last violation, from working for <u>any</u> staffing business that competes with Creative Circle (including but not limited to 24 Seven), or otherwise competing with Creative Circle's business, within a 50 mile radius of Creative Circle's New York City office or within a 50 mile radius of any Creative Circle office over which Bortone had supervisory, managerial or administrative responsibilities;

c.     An order restraining and enjoining Bortone, for a period of 12 months from the date of her last violation, from directly or indirectly soliciting, seeking to employ or retaining the services of any employee or independent contractor who worked for Creative Circle within the previous 12 months;

d.     An order restraining and enjoining Bortone, for a period of 12 months from the date of her last violation, from directly or indirectly soliciting or seeking to place any temporary employee or independent contractor candidate whom Bortone had directly or indirectly placed or sought to place on behalf of Creative Circle, or whose identity Bortone learned while employed by Creative Circle, or from persuading such candidate to alter or reduce his/her services for Creative Circle;

33

e.    An order restraining and enjoining Bortone, for a period of 12 months from the date of her last violation, from directly or indirectly soliciting or providing services to Creative Circle customers whom Bortone serviced or sought to service on behalf of Creative Circle, or whose identity Bortone learned while employed by Creative Circle, or from persuading such customer to alter or reduce its use of services from Creative Circle;

f.    An order restraining and enjoining Defendants from using or disclosing any of Creative Circle's confidential, proprietary and trade secret information and requiring Defendants to return any such information currently in their possession;

g.    An order restraining and enjoining Defendants from raiding, poaching soliciting, recruiting or seeking to employ any Creative Circle employee;

h.    Disgorgement of any profits, commissions or monies earned by Bortone as a result of her unlawful conduct;

i.    Compensatory, consequential and punitive damages;

j.    Prejudgment Interest;

k.    An award of attorneys' fees and costs; and

l.    Such further relief as the Court may deem just and equitable.

## COUNT SIX

### TORTIOUS INTERFERENCE WITH CONTRACT
### (As Against 24 Seven, Rooker, Kenny and DiBella)

137.    Creative Circle repeats and realleges the allegations set forth above as if fully set forth and repeated herein.

138.    Defendants 24 Seven, Rooker, Kenny and DiBella were aware of the fact that Creative Circle employees sign agreements that explicitly prohibit them from, among other

34

things, working for competitors within a defined geographic area for a period of 12 months, soliciting Creative Circle's customers, candidates or employees or using Creative Circle's Confidential Information.

139.    Defendants 24 Seven, Rooker, Kenny and DiBella have induced or are attempting to induce Creative Circle employees to breach their contracts with Creative Circle.

140.    Defendants 24 Seven and DiBella were specifically aware of the fact that Bortone had an Agreement with Creative Circle and nevertheless intentionally induced Bortone to violate her Agreement.

141.    Defendants 24 Seven, Rooker, Kenny and DiBella repeatedly and intentionally have induced or are attempting to induce Creative Circle employees to breach their Agreements with Creative Circle despite knowing that Bortone and any other Creative Circle employees who were successfully recruited would be breaching their Agreements with Creative Circle, would use and/or disclose their knowledge of Creative Circle's Confidential Information to unfairly compete with Creative Circle and would convert Creative Circle's good will with its clients and candidates to a direct competitor.  Defendants 24 Seven, Rooker, Kenny and DiBella acted, and continue to act, with the intent to induce Creative Circle's employees to breach their agreements.

142.    Further, upon information and belief, 24 Seven advised Creative Circle employees who it solicited, including but not limited to Bortone, that it will protect them from any actions taken by Creative Circle to enforce their Agreements, including providing them with legal defense and indemnifying them for any damages incurred.

143.    By virtue of the foregoing tortious interference with contract, Creative Circle has suffered and is continuously faced with immediate and irreparable injury.

144.    Creative Circle is likely to succeed on the merits of its claims.

145.   Creative Circle has no adequate remedy at law, and will suffer substantial and immediate irreparable harm unless Defendants 24 Seven, Rooker, Kenny and DiBella are enjoined as requested below.

146.   Greater injury will be inflicted upon Creative Circle by the denial of this relief than will be inflicted on Defendants 24 Seven, Rooker, Kenny and DiBella by the granting of such relief.

**WHEREFORE**, Creative Circle demands judgment against Defendants 24 Seven, Rooker, Kenny and DiBella as follows:

a.   An order restraining and enjoining Defendants 24 Seven, Rooker, DiBella and Kenny from raiding, poaching soliciting, recruiting or seeking to employ any Creative Circle employee;

b.   An order restraining and enjoining Defendants 24 Seven, Rooker, DiBella and Kenny from inducing any Creative Circle employee to breach his/her contract with Creative Circle;

c.   An order enjoining and restraining 24 Seven from employing Bortone, in any capacity for a period of 12 months;

d.   Disgorgement of any profits, commissions or monies earned by Defendants 24 Seven, Rooker, Kenny and DiBella as a result of their unlawful conduct;

e.   Compensatory, consequential and punitive damages;

f.   Prejudgment Interest; and

g.   An award of attorneys' fees and costs.

## COUNT SEVEN

**TORTIOUS INTERFERENCE WITH PROSPECTIVE ECONOMIC RELATIONS**

**(As Against All Defendants)**

147.     Creative Circle repeats and realleges the allegations set forth above as if fully set forth and repeated herein.

148.     By their aforesaid actions, Defendants are intentionally, maliciously and without justification interfering with Creative Circle's current and prospective business relationships with its customers, candidates and employees.

149.     Creative Circle has a bona fide and reasonable expectancy of a continuing and prosperous commercial relationship with its customers and candidates.

150.     Defendants knew of Creative Circle's bona fide and reasonable expectancy of continuing these prosperous commercial relationships with its customers, candidates and employees, and nevertheless engaged in their actions with the intent to harm Creative Circle's business and without justification or excuse.

151.     Defendants have interfered, or are attempting to interfere, with Creative Circle's prospective economic advantage with those customers and candidates that would have directed that business to Creative Circle but for Defendants' illegal actions.

152.     Defendants have interfered, or are attempting to interfere, with Creative Circle's prospective economic advantage with its employees, who would have remained employed with Creative Circle but for Defendants' illegal actions.

153.     Further, upon information and belief, 24 Seven advised Creative Circle employees who it solicited, including but not limited to Bortone, that it will protect them from any actions taken by Creative Circle to enforce their Agreements, including providing them with legal defense and indemnifying them for any damages incurred.

154.     By virtue of the foregoing tortious interference with prospective economic relations, Creative Circle has suffered and is continuously faced with immediate and irreparable injury.

155.     Creative Circle is likely to succeed on the merits of its claims.

156.     Creative Circle has no adequate remedy at law, and will suffer substantial and immediate irreparable harm unless Defendants are enjoined as requested below.

157.     Greater injury will be inflicted upon Creative Circle by the denial of this relief than will be inflicted on Defendants by the granting of such relief.

**WHEREFORE**, Creative Circle demands judgment against all Defendants as follows:

a.     An order restraining and enjoining Bortone, for a period of 12 months from the date of her last violation, from working for 24 Seven at any location within a 50 mile radius of Creative Circle's New York City office or within a 50 mile radius of any Creative Circle office over which Bortone had supervisory, managerial or administrative responsibilities;

b.     An order restraining and enjoining Bortone, for a period of 12 months from the date of her last violation, from working for any staffing business that competes with Creative Circle (including but not limited to 24 Seven), or otherwise competing with Creative Circle's business, within a 50 mile radius of Creative Circle's New York City office or within a 50 mile radius of any Creative Circle office over which Bortone had supervisory, managerial or administrative responsibilities;

c.     An order restraining and enjoining Bortone, for a period of 12 months from the date of her last violation, from directly or indirectly soliciting, seeking to employ or retaining the services of any employee or independent contractor who worked for Creative Circle within the previous 12 months;

d.     An order restraining and enjoining Bortone, for a period of 12 months from the date of her last violation, from directly or indirectly soliciting or seeking to place any temporary employee or independent contractor candidate whom Bortone had directly or indirectly placed or sought to place on behalf of Creative Circle, or whose identity Bortone learned while employed by Creative Circle, or from persuading such candidate to alter or reduce his/her services for Creative Circle;

e.     An order restraining and enjoining Bortone, for a period of 12 months from the date of her last violation, from directly or indirectly soliciting or providing services to Creative Circle customers whom Bortone serviced or sought to service on behalf of Creative Circle, or whose identity Bortone learned while employed by Creative Circle, or from persuading such customer to alter or reduce its use of services from Creative Circle;

f.     An order restraining and enjoining Defendants from using or disclosing any of Creative Circle's confidential, proprietary and trade secret information and requiring Defendants to return any such information currently in their possession;

g.     An order restraining and enjoining Defendants from raiding, poaching soliciting, recruiting or seeking to employ any Creative Circle employee;

h.      Disgorgement of any profits, commissions or monies earned by Bortone as a result of her unlawful conduct;

i.      Compensatory, consequential and punitive damages;

j.      Prejudgment Interest;

k.      An award of attorneys' fees and costs; and

l.      Such further relief as the Court may deem just and equitable.

## COUNT EIGHT

### CIVIL CONSPIRACY
### (As Against All Defendants)

158.    Creative Circle repeats and realleges the allegations set forth above as if fully set forth and repeated herein.

159.    Defendants have intentionally colluded in a common plan to divert business, customers, candidates and employees away from Creative Circle to 24 Seven.

160.    Defendants have conspired to violate Creative Circle's Agreement with Bortone, as well as its Agreements with other employees.

161.    Defendants have conspired with one another to steal Creative Circle's customers, candidates and employees.

162.    By virtue of Defendants conspiracy, Creative Circle has suffered and is continuously faced with immediate and irreparable injury.

163.    Creative Circle is likely to succeed on the merits of its claims.

164.    Creative Circle has no adequate remedy at law, and will suffer substantial and immediate irreparable harm unless Defendants are enjoined as requested below.

165.    Greater injury will be inflicted upon Creative Circle by the denial of this relief than will be inflicted on Defendants by the granting of such relief.

**WHEREFORE**, Creative Circle demands judgment against all Defendants as follows:

    a.    An order restraining and enjoining Bortone, for a period of 12 months from the date of her last violation, from working for 24 Seven at any location within a 50 mile radius of Creative Circle's New York City office or within a 50 mile radius of any Creative Circle office over which Bortone had supervisory, managerial or administrative responsibilities;

    b.    An order restraining and enjoining Bortone, for a period of 12 months from the date of her last violation, from working for <u>any</u> staffing business that competes with Creative Circle (including but not limited to 24 Seven), or otherwise competing with Creative Circle's business, within a 50 mile radius of Creative Circle's New York City office or within a 50 mile radius of any Creative Circle office over which Bortone had supervisory, managerial or administrative responsibilities;

    c.    An order restraining and enjoining Bortone, for a period of 12 months from the date of her last violation, from directly or indirectly soliciting, seeking to employ or retaining the services of any employee or independent contractor who worked for Creative Circle within the previous 12 months;

    d.    An order restraining and enjoining Bortone, for a period of 12 months from the date of her last violation, from directly or indirectly soliciting or seeking to place any temporary employee or independent contractor candidate whom Bortone had directly or indirectly placed or sought to place on behalf of Creative Circle, or whose identity Bortone learned

41

while employed by Creative Circle, or from persuading such candidate to alter or reduce his/her services for Creative Circle;

e.   An order restraining and enjoining Bortone, for a period of 12 months from the date of her last violation, from directly or indirectly soliciting or providing services to Creative Circle customers whom Bortone serviced or sought to service on behalf of Creative Circle, or whose identity Bortone learned while employed by Creative Circle, or from persuading such customer to alter or reduce its use of services from Creative Circle;

f.   An order restraining and enjoining Defendants from using or disclosing any of Creative Circle's confidential, proprietary and trade secret information and requiring Defendants to return any such information currently in their possession;

g.   An order restraining and enjoining Defendants from raiding, poaching soliciting, recruiting or seeking to employ any Creative Circle employee;

h.   Disgorgement of any profits, commissions or monies earned by Bortone as a result of her unlawful conduct;

i.   Compensatory, consequential and punitive damages;

j.   Prejudgment Interest;

k.   An award of attorneys' fees and costs; and

l.   Such further relief as the Court may deem just and equitable.

## COUNT NINE

### ATTORNEYS' FEES
### (As Against Bortone)

166.   Creative Circle repeats and realleges the allegations set forth above as if fully set forth and repeated herein.

42

167.   Section 8.0 of the Agreement provides that, if Creative Circle prevails in whole or in part in an action to enforce rights under the Agreement, Creative Circle shall be entitled to recover from Bortone its reasonable attorneys' fees, costs and expenses associated with such action.

168.   By virtue of the foregoing tortious interference with prospective economic relations, Creative Circle has suffered and is continuously faced with immediate and irreparable injury.

**WHEREFORE**, Creative Circle demands judgment against Bortone and 24 Seven as follows:

a.   An order granting Creative Circle its attorneys' fees and costs in connection with this action; and

b.   Such further relief as the Court may deem just and equitable.

Dated: New York, New York
       August 13, 2018

                              **LITTLER MENDELSON, P.C.**


                              By: _____

                                  Stacey D. Adams
                                  Tyler A. Sims
                                  900 Third Avenue - 8th Floor
                                  New York, New York 10022
                                  Telephone: (212) 583-9600
                                  *Attorneys for Plaintiff*
                                  *Creative Circle, LLC*

## **VERIFICATION**

Melissa Sanchez, of full age, hereby states pursuant to 28 U.S.C. § 1746:

        1.    I am a Senior Vice President, Operations of Creative Circle, LLC, Plaintiff in this proceeding.

        2.    I have reviewed the foregoing Verified Complaint, and the same is true to the best of my knowledge, except as to matters alleged upon information and belief, and as to those matters I believe them to be true.

I state under penalty of perjury that the foregoing is true and correct.

Executed on August _13_, 2018

                                            _Melissa Sanchez_
                                                Melissa Sanchez

# EXHIBIT A



## CONFIDENTIALITY, NON-SOLICITATION
## AND NON-COMPETITION AGREEMENT

This Confidentiality, Non-Solicitation and Non-Competition Agreement ("Agreement") is made by and between Creative Circle, LLC. (hereinafter "Employer," "Company" or "Creative Circle") and  Susan Norelle-Bortone  ("Employee"):

1.0    Confidential Information and Company Property

1.1    Employee acknowledges that Employer and its parents, subsidiaries, divisions and affiliates, as well as majority-owned companies of such parents, subsidiaries, divisions and affiliates, and their respective successors (hereinafter collectively, the "Company") possess certain Confidential Information which has been and will be revealed to or learned by Employee during Employee's employment with the Company. Employee acknowledges that the term "Confidential Information" includes all information that has or could have commercial value or other utility in the Company's Business (as defined below), or the unauthorized disclosure of which could be detrimental to the Company's interests, whether or not such information is specifically identified as Confidential Information by the Company.

1.2    Employee acknowledges that the Company's Business includes any or all of the following: (a) providing digital, marketing, advertising, and creative talent to both creative agencies and other businesses, for temporary or, direct hire opportunities; and (b) such other businesses as the Company may enter or make preparation to enter subsequent to the date that this Agreement is executed.

1.3    Confidential Information includes any and all information whether written or verbal, or contained on computer hardware or software, disk, tape, microfiche or other media, whether or not meeting the legal definition of a trade secret, containing and/or concerning: (a) the Company's business plans, strategic plans, forecasts, budgets, sales, projections and costs; (b) the Company's personnel and payroll records, employee lists, prospective employee lists, employee salaries, and contracts and wage information; (c) candidates, consultants, contractors, including lists, identities, resumes, preferences, transaction histories, rates and related information, and other characteristics; (d) the Company's customers and prospective customers, including their identity, the identities of their employees, contractors and consultants, special needs, job orders, preferences, transaction histories, contacts, other characteristics, agreements and prices; (e) marketing activities, plans, promotions, operations, research and development, advertising sources, the techniques used in, approaches to, or results of any market research, and other marketing data; (f) business operations, internal structures and financial affairs; (g) systems and procedures, and methods of production; (h) pricing structure, pricing information (such as price lists, quotation guides, previous or outstanding quotations, or billing information); (i) proposed or pending projects, services and products; (j) contracts with other parties; (k) Company customer history and technical information; (l) information contained on CircleView and any other system that may replace it over time; (m) computer techniques and processing capabilities; (n) proprietary computer programs; (o) business plans and projections, including new product, facility or expansion plans; (p) estimating programs and methodology; and (q) training materials. The Company may allow, expressly or impliedly, the inclusion of part or all of the above-referenced Confidential Information to be included on a social media site. The inclusion of this Confidential Information shall NOT be construed as a waiver of Company's rights to assert control or ownership of the Confidential Information. For avoidance of doubt, the parties further agree that any and all Confidential Information learned by Employee during the course of or incidental to employment with Company shall remain

1



property of Company and no inclusion of said Confidential Information on any public or social media site shall act as a waiver of Company's rights to such Confidential Information. Confidential Information does not include information that can be shown by documented evidence has become widely known to the public other than through the improper disclosure of such information. Notwithstanding anything to the contrary in this Agreement, however, Confidential Information includes any and all information that the Company is obligated to maintain as confidential or that the Company may receive or has received from others with any understanding, express or implied, that it will not be disclosed.

1.4     During the term of Employee's employment with the Company and thereafter, Employee will not, directly or indirectly, use or disclose to anyone, or authorize disclosure or use of, any of the Confidential Information revealed to or learned by Employee, unless such use or disclosure is both consistent with the Company's obligations and for the sole purpose of carrying out Employee's duties to the Company. Employee understands and agrees that this restriction will continue to apply after Employee's employment with the Company terminates, regardless of the reason for such termination. Employee agrees to comply with all policies and procedures of the Company for protecting Confidential Information. Where required by state law to be enforceable, the forgoing nondisclosure provision is limited to two years for confidential information that does not rise to the level of a trade secret.

1.5     Employee acknowledges that protecting and safeguarding Confidential Information is essential to the Company's Business. Employee agrees that Employee will not make any copies of Confidential Information, or other Company property except as expressly authorized by the Company. Employee agrees that upon termination of employment, Employee will immediately return to the Company any and all Company property and documents and other media containing Confidential Information (and all copies thereof) in Employee's possession, custody or control. The Company's property includes but is not limited to any and all documents, instruments, records and databases, recorded or stored on any medium whatsoever, relating or pertaining, directly or indirectly, to the business of the Company, including without limitation any and all documents (and copies) containing or relating to the Company's Confidential Information. Employee acknowledges that this material is solely the property of the Company.

2.0     Employee Responsibilities and Restrictive Covenants

2.1     During the term of Employee's employment with the Company, Employee agrees: (a) to devote Employee's best efforts and entire business time and attention to the Company's business; and (b) that Employee will not, directly or indirectly (i) operate, engage in, assist, be employed by, or have any interest in any business activity of or for the benefit of any person or entity other than the Company or (ii) have any ownership interest in any business activity that engages in or is planning to engage in the Company's Business, that does business with the Company, or whose ownership would otherwise create a conflict of interest, except as otherwise approved in writing by the Company, which approval the Company may in its absolute discretion withhold.

2.2     Employee agrees that, for a period of twelve (12) months after the termination of Employee's employment, Employee will not, directly or indirectly: (a) compete with the Company's Business or otherwise own, maintain, operate, engage in, assist, be employed by, or have any interest in any business engaging in or planning or preparing to be engaged in the Company's Business, within a fifty (50) mile radius of any office of the Company (i) as to which the Employee was assigned or (ii) over which Employee had supervisory, managerial or administrative responsibilities during the last twelve (12) months of his/her employment with the Company; or (b) accept employment with a Company

2



customer to whom Employee provided any services on behalf of Company during the last twelve (12) months of his/her employment with the Company.

2.3     Employee agrees that, during the term of Employee's employment with the Company, and for a period of twelve (12) months following the termination of Employee's employment, Employee will not, directly or indirectly:

(a)     (i) solicit, seek to employ, or seek to retain the services of any person who is at that time or was within the previous twelve (12) months providing services to the Company as an employee or independent contractor, or (ii) persuade, induce or attempt to persuade or induce any such person to leave his/her employment or to refrain from providing services to the Company; or

(b)     (i) solicit or seek to place any temporary employee or independent contractor candidate directly or indirectly placed by Employee or sought to be placed by Employee, or whose identity Employee learned while employed by the Company, which placement is for or on behalf of any entity engaged in or seeking to be engaged in the Company's Business, or (ii) persuade, induce or attempt to persuade or induce any such person to leave his/her temporary employment or to refrain from providing services to the Company or its customers; or

(c)     (i) solicit or seek to provide services to any customer directly or indirectly serviced by Employee or sought to be serviced by Employee, or whose identity Employee learned while employed by the Company, which solicitation is for or on behalf of any entity engaged in or seeking to be engaged in the Company's Business, or (ii) persuade, induce or attempt to persuade or induce any such entity to alter or reduce its use of services from the Company.

2.4     Employee agrees that, for a period of twelve (12) months after the termination of Employee's employment, Employee will promptly inform Employer in writing of any employment or other business affiliations that Employee has with any business or business entity offering or planning to offer a service or product in competition with the Company. Such information will include, but not be limited to: (a) the name and address of the business or business entity with which Employee has such a relationship; and (b) the general nature of Employee's business-related activities. To the extent requested by Employer, Employee agrees to provide such additional information as Employer reasonably believes to be necessary for Employer to ascertain whether Employee is complying with this Agreement. For purposes of this paragraph, a written letter or email to Company's Legal and/or Human Resources Department shall serve as proper notice.

2.5     Employee agrees that in the event Employee breaches this Section 2 during the twelve (12) month period following the termination of Employee's employment, this Agreement shall be extended automatically as follows: the duration of such extension shall equal the period of time between the date Employee began such violation and the date Employee permanently ceases such violation. An alleged breach of any other provision of this Agreement asserted by Employee shall not be a defense to claims arising from the Company's enforcement of this Section.

2.6     Nothing in Section 2 will prohibit Employee from owning up to 5% or $100,000, whichever is less, of any class of equity or debt securities that are traded on a national securities exchange.



### 3.0    Company Access

Employee agrees and consents that, during the term of Employee's employment with the Company and thereafter, the Company may review, audit, intercept, access and disclose all messages created, received or sent over the voice mail, electronic mail and Internet access systems provided by the Company, with or without notice to Employee, and that such review, audit, interception, access, or disclosure may occur during or after work hours. Employee further consents and agrees that the Company may, at any time, access and review the contents of all telephones and related systems, computers, computer disks, other data storage equipment and devices, files, desks, drawers, closets, cabinets and work stations which are either on Company's premises or which are owned or provided by Company. Employee further allows Company to use, without the necessity of securing additional permission, Employee's likeness for use in marketing materials, print materials, advertising and promotional materials and/or online advertising.

### 4.0    Employee Representations

4.1    Employee represents and warrants that: (a) this Agreement and Employee's employment by the Company do not conflict with and will not be constrained by any prior business or employment relationship or contract; and (b) Employee will not at any time while an employee of Company, use, rely upon or otherwise refer to confidential information, trade secrets or other proprietary information belonging to another or arising out of any prior business or employment relationship or contract. Employee further agrees that Employee will not disclose any such trade secrets or other proprietary information belonging to third parties to the Company or others. Employee agrees to hold the Company harmless from any and all claims arising out of any agreements containing restrictive covenants limiting or potentially limiting Employee's ability to work for the Company other than those agreements, if any, expressly listed in Attachment A. Employee agrees to reimburse the Company for any and all losses, damages, claims, expenses and costs arising out of or relating to the defense by the Company of any such suit commenced against the Company, including attorneys' fees incurred by the Company in connection with defending such a suit. The Company shall be under no obligation to assist Employee in any such contract dispute with a prior employer, and in the event that Employee is enjoined or prohibited from working for the Company, the Company shall have no obligations to Employee.

4.2    Employee represents and warrants that if Employee's employment with the Company were to terminate, Employee could earn a living while fully complying with all the terms of this Agreement and that the restrictions contained in this Agreement are reasonable and necessary to protect the Company's legitimate interests in its Confidential Information, good will and customer relationships.

### 5.0    Interpretations of Agreement

5.1    Wherever this Agreement contemplates that Employee will have an obligation or restriction at or after the term of Employee's employment with the Company, Employee agrees that such obligation or restriction will exist without regard for which party to the Agreement terminates the employment relationship, and without regard for the reason (or lack thereof) for the termination of the employment relationship.

5.2    Employer and Employee agree that this Agreement constitutes the entire understanding and agreement of Employee and the Company with respect to the subject matter of this Agreement, and supersedes all prior and contemporaneous agreements or understandings, inducements or



conditions, express or implied, written or oral, between the Company and Employee, including any such agreement entered into with any division or subsidiaries of Creative Circle or any predecessors of Creative Circle.

5.3     Employer and Employee agree that if any provision of this Agreement, or part or application thereof, will for any reason and to any extent be invalid or unenforceable, such provision will be deemed severable and the remainder of this Agreement will remain valid and fully enforceable. Employer and Employee further consent and agree to a court modifying any restriction herein found to be unenforceable so as to make it enforceable to protect Company's legitimate business interests.

5.4     Employee agrees that if any portion or provision of this Agreement is held unreasonable or unenforceable by a court of competent jurisdiction, then the remainder of this Agreement, and the application of such portion or provision in circumstances other than those as to which it is so declared illegal or unenforceable, shall not be affected thereby, and each portion or provision of this Agreement shall be valid and enforceable to the fullest extent permitted by law.

5.5     The headings in this Agreement are included solely for convenience and will be given no effect in the construction of this Agreement.

5.6     The parties agree that this Agreement accurately reflects both parties' intent and understanding and should not be presumptively construed against either party in the event that there is any dispute over the meaning or intent of any provision.

6.0     Enforcement of Agreement

6.1     If requested by the Company, Employee agrees, at any time during the term of Employee's employment and thereafter, to reaffirm in writing the obligations imposed by, and Employee's past compliance with, any or all of the provisions of this Agreement.

6.2     Employee acknowledges and agrees that the covenants contained in Sections 1 and 2 of this Agreement are necessary to protect the proprietary and related interests of the Company, and that the limitations contained in these covenants are reasonable with respect to duration, geographical area and scope of activities, and do not impose a greater restraint than is necessary to protect the Confidential Information, goodwill, and other business interests of the Company.    Employee acknowledges and agrees that any breach of Section 1 or 2 of this Agreement will cause irreparable harm to the Company, for which a remedy in the form of damages will not be adequate or otherwise ascertainable. Employee therefore agrees that the Company will be entitled to temporary, preliminary and permanent injunctive relief against Employee, without having to post bond.  This section will not limit any other legal or equitable remedies that the Company may have against Employee for violations of these restrictions.

6.3     Employer and Employee agree that this Agreement will be governed by the laws of the state in which Employee last regularly worked for Employer, without giving effect to the conflict of laws provisions thereof.



## 7.0    General

7.1    Employer and Employee agree that this Agreement will be binding upon and inure to the benefit of the Company, its successors and assigns, without the need for further agreement or consent by Employee.

7.2    Employer and Employee agree that any term or provision of this Agreement may be amended or waived only by a writing signed by Employee and an officer of Employer or by court order. The failure of either party to enforce any of the provisions in this Agreement will not be construed to be a waiver of the right of that party to enforce any such provision thereafter.

7.3    Employee herby acknowledges that Employee has received good, valuable, and sufficient consideration for Employee's obligations hereunder, including, without limitation, the Company's agreement to extend an offer of at-will employment to Employee, to continue Employee's at-will employment, and/or to provide cash bonuses or equity grants, as applicable. Employee's employment can be terminated with or without cause by Employee or the Company at any time. Nothing contained in this Agreement will limit or otherwise alter the foregoing. Further consideration for this Agreement is provided by Company's disclosure of such Confidential Information to Employee as is necessary for the performance of Employee's duties.

7.4    Employee agrees that this Agreement is not confidential, and that the Company may, during the term of Employee's employment with the Company and thereafter, provide copies of this Agreement to others, including persons or entities that may employ, do business with, or consider employing or doing business with Employee in the future, along with an opinion regarding the enforceability of this Agreement.

7.5    By Employee's signature below, Employee acknowledges that Employee (a) has had sufficient opportunity to read each provision of this Agreement and understands each provision, (b) has had an opportunity to review the Agreement with legal counsel of Employee's choice, (c) is not under duress, and (d) is not relying on any representations or promises that are not set forth in the Agreement.

## 8.0    Enforcement

In the event Employee breaches or fails to honor any term of this Agreement, the parties agree that in the event Employer is successful in whole or in part in any legal or equitable action to defend its right under or to enforce any terms of this Agreement, Employer shall be entitled to payment of all costs, expenses, and reasonable attorney fees associated with such action, from Employee.

Multistate Local – Creative Circle    Updated 6/15

creativecircle
ADVERTISING · CREATIVE STAFFING

EMPLOYEE:                                    CREATIVE CIRCLE, LLC

Signature:                                   Signature:

Name (Print):   Susan Norelle-Bortone        Name:      Robin Elledge

Title:          Sr. Account Executive         Title:     Chief Administrative Officer

Date:           6.30.15                       Date:      June 24, 2015

Multistate Local – Creative Circle                                    Updated 6/15



## <u>ATTACHMENT A</u>

The following is a complete list of all agreements containing restrictive covenants limiting or potentially limiting Employee's ability to work for the Company.

☑   None. I am not a party to any agreement which restricts or otherwise prohibits me from being employed by Company.

☐   List of agreements:

_____
_____
_____
_____
_____
_____
_____

☐   Additional sheets are attached.

EMPLOYEE:

Signature: _____

Name:      Susan Norelle-Bortone
(Print)
Title:     Sr. Account Executive

Date:      6. 30. 15

# EXHIBIT B

July 2, 2018

Melissa Sanchez
Creative Circle
300 S. Park Ave – 7th Floor
NY, NY 10010

Dear Melissa,

Effective July 13, 2018, I will be leaving Creative Circle. I am officially giving 2 weeks notice as of today, July 2, 2018. I thank everyone for my time with the company and wish to leave on the best possible terms with nothing but the best of wishes for the growth and success of Creative Circle. It has been an amazing experience, but I have decided that at this time in my career, I no longer wish to pursue a sales career.

As part of my departure and wanting to ensure the integrity and further success of the relationships with Creative Circle and my current list of clients, I have made a list of recommended Account Executives to take over my accounts. I am happy to fully brief them, make the introductions to the new Creative Circle Account Executive and client via phone, email or in person. I have also highlighted in Circle View the main client contacts at those companies, which the new Creative Circle Account Executives should be reaching out to and pursuing relationships with.

In the interest of transparency and respect for Creative Circle I wanted to advise you that I will be joining 24seven as a Senior Director of Training and Development. I hereby promise to respect the guidelines of my Confidentiality, Non-Solicitation and Non-Compete Agreement in that I will not, during the period outlined in the Agreement:

- Be in a sales role or sell in any capacity on behalf of my new employer or have a book of business or a contact / client list in which I will in any way be affiliated.

- Share any information in regards to data, financials (including office/company revenues, mark-ups, gross margins, bill rates, pay rates, hours, start or goals) metrics or other confidential information.

- Solicit engagement from any candidates or clients to work with my new employer or solicit any current or future Creative Circle employees to work with said employer.

- Share any contact information – including names, titles, phone numbers or emails -for any clients or candidates I have been in touch with over the past year at Creative Circle.

- Disclose any contract terms for my own clients, clients I have advised on negotiations for or had information shared with me in regards to agreed upon terms.

- Discuss Creative Circle best practices, procedures or upcoming initiatives.

- Discuss any confidential information provided by clients in regards to their business.

Additionally, I will not be involved in discussions of any business nature, nor shall I solicit contacts at the following companies over the next year. (This will include but not be limited to any insight as to contacts, placements, contract terms, bill rates/mark-ups or projects):

NBC and affiliates

McCann

MRM

Craft

Mediabrands (including Reprise, Initiative, Society, UM, J3)

Ogilvy

Havas

Havas Media

Havas Life

TBWA/Chiat

Fresh

Elizabeth Arden / Revlon

Turner and affiliates

MediaCom

GroupM

MXM

Meredith

Kenneth Cole

Michael Kors

USA Today

Gap

SiriusXM

Eg+

Based on the above set guidelines, I am requesting a waiver of the Agreement so I can pursue the Senior Director of Training and Development at 24seven. As per the above, all previously set forth confidentiality and non-solicit terms would still hold to be true. I will not hold an active sales role where I will directly compete with Creative

Circle for the next year and at this time have no intentions to do so beyond that point either. If I could please have an officer countersign this document to indicate acceptance of this waiver, I would greatly appreciate.

Many thanks again for having had the amazing opportunity to call myself part of the Creative Circle family. I am so grateful for my time here and I have nothing but the best of wishes for the company and everyone here.

Best – Susan Norelle Bortone


_____
Susan Norelle Bortone

_____
Date


Creative Circle


_____
Name

_____
Title

_____
Date

# EXHIBIT C



July 6, 2018

**_VIA FEDERAL EXPRESS OVERNIGHT MAIL_**
**_AND ELECTRONIC MAIL_**

Ms. Susan Norelle Bortone
44 Afterglow Ave
Verona, NJ  07044
snorelle@creativecircle.com

      **Re:**    **Confidentiality, Non-Solicitation and Non-Competition Agreement
                  with Creative Circle, LLC**

Dear Susan:

We have received your July 2, 2018 letter regarding your intention to resign from your
position with Creative Circle and go to work for Creative Circle's direct competitor,
24/Seven. We thank you for your many years of work with Creative Circle and the
integral part of our business that you have become during this past twelve years. As you
implicitly acknowledge in your letter, going to work for this competing business is a
direct violation of your obligations under the Confidentiality, Non-Solicitation, and Non-
Competition Agreement you entered into with Creative Circle ("Agreement"),
notwithstanding your assertions of how you plan to conduct business at this competitor.
By this letter, we inform and confirm to you that Creative Circle is not waiving any
provision of the Agreement. In addition, as you wind down your employment with
Creative Circle, please be reminded that you should not take with you, or send to
yourself or anyone else, any of Creative Circle's confidential information or property.

Regards,

Wendy Gerard /kg

Wendy Gerard
General Counsel

# EXHIBIT D



July 6, 2018

**_VIA FEDERAL EXPRESS_**

Ms. Celeste Gudas
Chief Executive Officer
41 Madison Ave
37th Floor
New York, NY 10010

Re:   **Susan Norelle Bortone; Confidentiality, Non-Solicitation and Non-
       Competition Agreement with Creative Circle, LLC**

Dear Ms. Gudas:

Our long service and senior level employee, Susan Norelle Bortone, has informed us
she is resigning and intends to go to work for 24/Seven. Please be advised that Ms.
Bortone has entered into a Confidentiality, Non-Solicitation, and Non-Compete
Agreement ("Agreement") with Creative Circle. A copy of the Agreement is attached for
your reference. Based upon information Ms. Bortone has provided us, the position with
24/Seven will be a direct violation of the Agreement. This letter is our notice to 24/Seven
of the Agreement and that Creative Circle intends to enforce it.

Regards,

Wendy Gerard
General Counsel

Encl.

# EXHIBIT E

REDACTED

**From:** Sue Norelle <snorelle@creativecircle.com>
**Sent:** Monday, July 9, 2018 9:02 AM


**To:** Wendy Gerard <wendy.gerard@asgn.com>
**Cc:** Melissa Sanchez <msanchez@creativecircle.com>
**Subject:** RE: Resignation; Confidentiality, Non-Solicitation, and Non-Competition Agreement

Hi Wendy.

I have received the attached. While I am, as disclosed going to 24seven, I will not be in a Sales/Account role, nor will I hold any type of book of business/client list there. I also fully understand that all information from Creative Circle is confidential and I have no intent to discuss any of it with them or anyone else, nor do I plan to solicit business from any of my current clients on their behalf.

As you can see from the attached, I fully value my time at Creative Circle and the relationships I have built on behalf of Creative Circle and have gone to great measure in my departure, to ensure those relationships remain with Creative Circle. I have made email intros to the newly assigned Creative Circle AE, set up intro meetings for the newly assigned Creative Circle AE, briefed Creative Circle AE on account details, highlighting for the Creative Circle AE my main contacts and set future events up for that AE as well. I do hope the newly assigned Creative Circle AEs can grow the business even further than I have over the past 12 years. I have nothing but the best wishes and the utmost respect for everyone on the Creative Circle team.

If you have any questions, feel free to let me know.

Best - Sue

**Sue Norelle-Bortone**  Lead Account Executive
Creative Circle | Digital + Creative Staffing
300 Park Ave South, 7th Floor, New York, NY 10010
(Temporary entrance at 290 PAS, enter on 22nd Street)
Tel 212.777.8001 | Fax 888.781.8818

creativecircle.com | facebook | twitter | LinkedIn | Instagram


**From:** Wendy Gerard [mailto:wendy.gerard@asgn.com]
**Sent:** Friday, July 6, 2018 9:31 PM
**To:** Sue Norelle <snorelle@creativecircle.com>
**Subject:** Resignation; Confidentiality, Non-Solicitation, and Non-Competition Agreement
**Importance:** High

Please see attached.

_____
**Wendy Gerard**
**VP and General Counsel**
**Creative Circle, LLC**
**Assistant General Counsel**
**ASGN Incorporated | NYSE: ASGN**

O: 818.878.3143
wendy.gerard@asgn.com
www.asgn.com

Talent for The Digital World ®

# EXHIBIT F

REDACTED

**From:** Wendy Gerard
**Sent:** Monday, July 9, 2018 5:17 PM
**To:** 'Sue Norelle'
**Subject:** RE: Resignation; Confidentiality, Non-Solicitation, and Non-Competition Agreement

Hi Sue:

We do appreciate your efforts during your notice period to transition the accounts to the newly-assigned AEs. However, although you say your position at 24/Seven will not be a sales or account executive role, the position is still in violation of the Agreement, and Creative Circle reiterates that it will not waive any of its rights or remedies under the Agreement.

Regards,

**Wendy Gerard**
**Assistant General Counsel**
**ASGN Incorporated | NYSE: ASGN**

O: 818.878.3143
wendy.gerard@asgn.com
www.asgn.com

Talent for The Digital World ®

**From:** Sue Norelle <snorelle@creativecircle.com>
**Sent:** Monday, July 9, 2018 9:02 AM
**To:** Wendy Gerard <wendy.gerard@asgn.com>
**Cc:** Melissa Sanchez <msanchez@creativecircle.com>
**Subject:** RE: Resignation; Confidentiality, Non-Solicitation, and Non-Competition Agreement

Hi Wendy.

I have received the attached. While I am, as disclosed going to 24seven, I will not be in a Sales/Account role, nor will I hold any type of book of business/client list there. I also fully understand that all information from Creative Circle is confidential and I have no intent to discuss any of it with them or anyone else, nor do I plan to solicit business from any of my current clients on their behalf.

As you can see from the attached, I fully value my time at Creative Circle and the relationships I have built on behalf of Creative Circle and have gone to great measure in my departure, to ensure those relationships remain with Creative Circle. I have made email intros to the newly assigned Creative Circle AE, set up intro meetings for the newly assigned Creative Circle AE, briefed Creative Circle AE on account details, highlighting for the Creative Circle AE my main contacts and set future events up for that AE as well. I do hope the newly assigned Creative Circle AEs can grow the business even further than I have over the past 12 years. I have nothing but the best wishes and the utmost respect for everyone on the Creative Circle team.

If you have any questions, feel free to let me know.

Best - Sue

**Sue Norelle-Bortone Lead Account Executive**
**Creative Circle | Digital + Creative Staffing**
300 Park Ave South, 7th Floor, New York, NY 10010
(Temporary entrance at 290 PAS, enter on 22nd Street)
Tel 212.777.8001 I Fax 888.781.8818

creativecircle.com | facebook | twitter | LinkedIn | Instagram

**From:** Wendy Gerard [mailto:wendy.gerard@asgn.com]
**Sent:** Friday, July 6, 2018 9:31 PM
**To:** Sue Norelle <snorelle@creativecircle.com>
**Subject:** Resignation; Confidentiality, Non-Solicitation, and Non-Competition Agreement
**Importance:** High

Please see attached.

_____

**Wendy Gerard**
**VP and General Counsel**
**Creative Circle, LLC**
**Assistant General Counsel**
**ASGN Incorporated | NYSE: ASGN**

O: 818.878.3143
wendy.gerard@asgn.com
www.asgn.com

Talent for The Digital World ®

The information transmitted, including attachments, is intended only for the person or entity to which it is addressed and may contain confidential and/or privileged material. Any review, retransmission, dissemination or other use of, or taking of any action in reliance upon this information by persons or entities other than the intended recipient is prohibited. If you received this e-mail in error, please notify the sender immediately by replying to the message and deleting the material from your computer.

# EXHIBIT G



July 10, 2018

**VIA FEDERAL EXPRESS**

Ms. Wendy Gerard
General Counsel
Creative Circle
5900 Wilshire Blvd., 11th Floor
Los Angeles, CA 90036

Dear Ms. Gerard:

I am in receipt of your letter dated July 6, 2018, addressed to Ms. Celeste Gudas, Chief Executive Officer of 24 Seven, LLC ("24 Seven"). Your letter refers to the Confidentiality, Non-Solicitation, and Non-Compete Agreement (the "Agreement") between Ms. Bortone and Creative Circle. You state in your letter your belief that Ms. Bortone's position with 24 Seven will be in direct violation of the Agreement, yet you do not explain any basis for this conclusion.

While I am sure Ms. Bortone conveyed the nature of her new role, it is important to note that she has accepted an offer to be the Director of Training and Development for 24 Seven. This is a non-client facing and non-sales related role. Although Ms. Bortone will be based in 24 Seven's New York City office, the position covers all of 24 Seven's U.S. operations. To be clear, Ms. Bortone will *not* be providing the same services for 24 Seven that she provided to Creative Circle.

Further, Ms. Bortone has informed 24 Seven of her confidentiality and non-solicitation obligations under the Agreement. As she will not be assuming a competing role at 24 Seven, there will not be any issue with her honoring these obligations. 24 Seven has made it clear that it does not need or want any confidential information regarding Creative Circle's operations, clients or candidates. I trust that this addresses any concerns you may have. I am available to discuss should you have any questions.

Nothing in this letter is intended to waive any of 24 Seven's rights, all of which are expressly reserved.

Sincerely,

Evan Lupion
Chief Counsel
24 Seven
elupion@24seveninc.com

# EXHIBIT H

**Adams, Stacey D.**

| | |
|---|---|
| **From:** | Wendy Gerard <wendy.gerard@asgn.com> |
| **Sent:** | Friday, July 20, 2018 12:29 PM |
| **To:** | elupion@24seveninc.com |
| **Subject:** | Susan Norelle Bortone |
| **Attachments:** | Norelle Bortone, Susan Confidentiality Agreement.pdf |
| **Importance:** | High |

Dear Mr. Lupion:

I've received your July 10, 2018 letter. Please see Ms. Bortone's Confidentiality, Non-Solicitation, and Non-Competition Agreement ("Agreement") attached and, in particular, her obligations under Section 2.2(a) thereof. You will note that, for a period of 12 months after termination of her employment, she has agreed not to be employed by a competing business within 50 miles of an office of the Company as to which she was assigned or over which she had supervisorial, managerial, or administrative responsibilities within the last 12 months of her employment. Accordingly, this covenant is not dependent on position held; if she is training employees to compete in the same market then that is, in fact, competing. Additionally, please note that the Agreement's terms restrict Ms. Bortone from direct or indirect solicitations. Thus, even if she is not personally soliciting, if she is indirectly involved in soliciting our clients, that is a violation. Finally, it appears you may not be aware that Ms. Bortone's duties at Creative Circle involved training employees.

Be advised that should Ms. Bortone violate the terms of the Agreement, Creative Circle will not hesitate to enforce its rights in court. Moreover, now that 24/Seven unquestionably has notice of the Agreement and Ms. Bortone's obligations thereunder, should it employ her in breach of her contractual obligations, Creative Circle will also pursue appropriate claims against 24/Seven, including but not limited to a claim of tortious interference.

This letter responds to your request for examples of how Ms. Bortone's planned employment by 24/Seven violates her obligations under the Agreement. It is not, however, an exhaustive listing of such violations and in no way limits Creative Circle's rights or remedies.

Regards,

**Wendy Gerard**
**General Counsel, Creative Circle, LLC**
**Assistant General Counsel**
**ASGN Incorporated | NYSE: ASGN**

O: 818.878.3143
wendy.gerard@asgn.com
www.asgn.com

Talent for The Digital World ®

# EXHIBIT I



**Littler Mendelson, P.C.**
One Newark Center - 8th Floor
Newark, New Jersey 07102

Stacey D. Adams
973.848.4738 direct
973.848.4700 main
973.741.2314 fax
sdadams@littler.com

August 3, 2018

VIA E-MAIL (**LROOKER@24SEVENINC.COM**)AND FEDERAL EXPRESS

Laura Rooker,
Lead Generation Specialist
24 SEVEN
41 Madison Avenue - 37th Floor
New York, New York 10010

Re:    **Creative Circle vs. Laura Rooker, Susan Bortone,**
       **24 Seven and Morgan Stanley Capital Partners**

Dear Ms. Rooker:

This firm represents Creative Circle, LLC ("Creative Circle"). We have recently learned that you are engaged in a deliberate and unlawful effort to recruit Creative Circle employees to leave their employment, breach their contracts with Creative Circle and come work for your current employer, 24 Seven. We are in possession of literally *hundreds* of e-mail and LinkedIn solicitations that you have personally sent to Creative Circle employees in what is clearly a concerted act of employee piracy and illegal raiding. We have previously made 24 Seven aware that these employees have signed "Confidentiality, Non-Solicitation and Non-Competition Agreements" (the "Agreements") with Creative Circle that would prevent them from working for 24 Seven, a direct competitor of Creative Circle. Indeed, we have good reason to believe that you are personally aware that these employees are contractually bound to Creative Circle – yet you nevertheless continue your efforts to poach these employees.

For the avoidance of any doubt, we attach a copy of Creative Circle's form Confidentiality, Non-Solicitation and Non-Competition Agreement. Creative Circle employees are required to sign an Agreement substantially in this form.

Inducing Creative Circle employees to breach their Agreements constitutes intentional and tortious interference with contract. Engaging in a planned campaign of mass recruiting directed at hundreds of Creative Circle employees – knowing full well that these employees are critical to Creative Circle's business and possess invaluable relationships and good will with Creative Circle's candidates and customers – in order to benefit 24 Seven amounts to unfair competition and tortious interference with business relations. Further, you can be held personally liable for these actions. Accordingly, Creative Circle hereby demands that you cease and desist from any further solicitations of its employees. If you fail to immediately stop engaging in these unlawful actions, Creative Circle will pursue legal action in Court.

Laura Rooker,
Lead Generation Specialist
24 SEVEN
August 3, 2018
Page 2

This letter also serves notify you, on behalf of Creative Circle, of your on-going duty to preserve evidence related in any way to: the recruitment or hiring of any Creative Circle employee; all communications between you and any Creative Circle employee, customer or candidate; all communications by or between you and any employee, agent, representative or contractor of 24 Seven concerning hiring and recruitment practices or concerning Creative Circle or any of its employees, customers or candidates; and all communications between you and any employees, agents or representatives of Morgan Stanley Capital Partners (a major investor in 24 Seven) concerning recruitment or hiring practices or strategies, or in any way concerning Creative Circle (collectively, the "Allegations").

You, and all other persons or entities within your control or supervision, or acting on your behalf, are required by law to maintain, preserve and protect any documents, electronically stored information, software and things that you or they know, or reasonably should know, are relevant to the Allegations, or which may lead to the discovery of admissible evidence. You are hereby given notice not to destroy, conceal or alter any paper documents or electronically stored information – including, but not limited to, all e-mail, text messages, voice mail, instant messages, postings, and messages sent by phone, personal e-mail accounts, or any social networking websites, including but not limited to Twitter, Facebook, LinkedIn, Snapchat, MySpace, Instagram, Tumblr, and blogs, as well as word processing documents and spreadsheet – generated by you and/or stored on your computers, smart phones, and other storage media related in any way to the Allegations.  This obligation extends to, but is not limited to, any electronic, documentary or other information stored in any areas under your control and/or on any computers, computer disks, Zip cartridges, CDs, DVDs, hard drives, servers, back-up media, and/or any other electronic storage devices; email, both sent and received, whether internally or externally; all word processed files, including drafts and revisions; spreadsheets, including drafts and revisions; all databases; all CAD (computer aided design) files, including drafts and revisions; all presentation data or slide shows produced by presentation software (such as Microsoft PowerPoint); all graphs, charts and other data produced by project management software (such as Microsoft Project); all data generated by calendaring, task management and personal information management (PIM) software (such as Microsoft Outlook or Lotus Notes); all data created with the use of personal data assistants (PDAs), such as iPhones, Blackberries, Droids, Galaxies, Vipers, or similar technology; all data created with the use of document management software; all data created with the use of paper and electronic mail logging and routing software; all Internet and Web-browser-generated history files, caches and "cookies" files; and any and all other files generated by users through the use of computers and/or telecommunications, including but not limited to text messages and voice mail.

Please be advised that the obligation to preserve evidence extends to all data, communications and other information stored on any **work or personal computer, smart phone, tablet or cell phone** used by you.  The obligation also applies to all communications stored at any web-based e-mail, cloud storage, social networking websites, blogs or instant message service to which you

Laura Rooker,
Lead Generation Specialist
24 SEVEN
August 3, 2018
Page 3

subscribe.   **To be clear, your duty to preserve extends not only to email but to any communications or postings made on LinkedIn, Facebook, Snapchat, Instagram or any other social media platform.** We also specifically request that you preserve any video or audio tape that contains any information relevant to the Allegations.

You should immediately suspend any software application, process, practice or procedure that might destroy, purge, erase, delete or alter any document, information or other evidence, including that which is stored electronically, that is or may be relevant to the Allegations. This includes, but is not limited to, any routine process, practice or procedure that might lead to the destruction of such electronic, documentary or other information and/or the deletion, overwriting (automatic or otherwise), reformatting or purging of information stored in electronic formats, such as hard drives, servers, backup tapes, and any other electronic storage devices.

In order to avoid spoliation, you will need to preserve the data requested on the original media. Electronically stored information and the storage media upon which it resides contains relevant, discoverable information beyond that which may be found on printed documents. Therefore, even where a paper copy exists, we will seek all documents in their electronically stored form, along with any information about those documents contained on the media. We will also seek paper printouts of those documents that contain unique information after they were printed out (such as paper documents containing handwriting, signatures, drawings, annotations, highlighting and redactions) along with any paper documents to which no corresponding electronic file exists.

Failure to comply with the duty to preserve all information that may be relevant in the above-referenced matter could result in sanctions, including both monetary and non-monetary sanctions. Thank you for your prompt attention to this matter and please be guided accordingly.

Very truly yours,

Stacey D. Adams

SDA/pnk
Enclosure
cc:      Evan Lupion, Esq. (via email elupion@24seveninc.com)

# EXHIBIT J



Littler Mendelson, P.C.
One Newark Center - 8th Floor
Newark, New Jersey 07102

Stacey D. Adams
973.848.4738 direct
973.848.4700 main
973.741.2314 fax
sdadams@littler.com

August 3, 2018

## VIA E-MAIL (DDIBELLA@24SEVENINC.COM)AND FEDERAL EXPRESS

David DiBella
Corporate Recruiter
24 SEVEN INC.
41 Madison Avenue - 37th Floor
New York, New York 10010

Re:   **Creative Circle vs. David DiBella, Susan Bortone,**
      **24 Seven and Morgan Stanley Capital Partners**

Dear Mr. DiBella:

This firm represents Creative Circle, LLC ("Creative Circle"). We have recently learned that you are engaged in a deliberate and unlawful effort to recruit Creative Circle employees to leave their employment, breach their contracts with Creative Circle and come work for your current employer, 24 Seven Inc. ("24 Seven"). We are in possession of numerous e-mails and LinkedIn solicitations that you and other 24 Seven employees have sent to Creative Circle employees in what is clearly a concerted act of employee piracy and illegal raiding. We have previously made 24 Seven aware that these employees have signed "Confidentiality, Non-Solicitation and Non-Competition Agreements" (the "Agreements") with Creative Circle that would prevent them from working for 24 Seven, a direct competitor of Creative Circle. Indeed, we have good reason to believe that you are personally aware that these employees are contractually bound to Creative Circle – yet you nevertheless continue your efforts to poach these employees. We also know that you personally have been targeting some of Creative Circle's more senior level employees and managers, and that you are the individual who successfully recruited Susan Norelle-Bortone, an extremely valuable employee, to leave her employment at Creative Circle, breach her contract with Creative Circle and come work for 24 Seven.

For the avoidance of any doubt, we attach a copy of Creative Circle's form Confidentiality, Non-Solicitation and Non-Competition Agreement. Creative Circle employees are required to sign an Agreement substantially in this form. As you are undoubtedly aware, Ms. Bortone signed such an Agreement.

Inducing Ms. Bortone and other Creative Circle employees to breach their Agreements constitutes intentional and tortious interference with contract. Engaging in a planned campaign of mass recruiting directed at hundreds of Creative Circle employees – knowing full well that

David DiBella
Corporate Recruiter
24 SEVEN INC.
August 3, 2018
Page 2

these employees are critical to Creative Circle's business and possess invaluable relationships and good will with Creative Circle's candidates and customers – in order to benefit 24 Seven amounts to unfair competition and tortious interference with business relations. Further, you can be held personally liable for these actions. Accordingly, Creative Circle hereby demands that you cease and desist from any further solicitations of its employees. If you fail to immediately stop engaging in these unlawful actions, Creative Circle will pursue legal action in Court.

This letter also serves notify you, on behalf of Creative Circle, of your on-going duty to preserve evidence related in any way to: the recruitment or hiring of any Creative Circle employee; all communications between you and any Creative Circle employee, customer or candidate; all communications by or between you and any employee, agent, representative or contractor of 24 Seven concerning hiring and recruitment practices or concerning Creative Circle or any of its employees, customers or candidates; and all communications between you and any employees, agents or representatives of Morgan Stanley Capital Partners (a major investor in 24 Seven) concerning recruitment or hiring practices or strategies, or in any way concerning Creative Circle (collectively, the "Allegations").

You, and all other persons or entities within your control or supervision, or acting on your behalf, are required by law to maintain, preserve and protect any documents, electronically stored information, software and things that you or they know, or reasonably should know, are relevant to the Allegations, or which may lead to the discovery of admissible evidence. You are hereby given notice not to destroy, conceal or alter any paper documents or electronically stored information – including, but not limited to, all e-mail, text messages, voice mail, instant messages, postings, and messages sent by phone, personal e-mail accounts, or any social networking websites, including but not limited to Twitter, Facebook, LinkedIn, Snapchat, MySpace, Instagram, Tumblr, and blogs, as well as word processing documents and spreadsheet – generated by you and/or stored on your computers, smart phones, and other storage media related in any way to the Allegations. This obligation extends to, but is not limited to, any electronic, documentary or other information stored in any areas under your control and/or on any computers, computer disks, Zip cartridges, CDs, DVDs, hard drives, servers, back-up media, and/or any other electronic storage devices; email, both sent and received, whether internally or externally; all word processed files, including drafts and revisions; spreadsheets, including drafts and revisions; all databases; all CAD (computer aided design) files, including drafts and revisions; all presentation data or slide shows produced by presentation software (such as Microsoft PowerPoint); all graphs, charts and other data produced by project management software (such as Microsoft Project); all data generated by calendaring, task management and personal information management (PIM) software (such as Microsoft Outlook or Lotus Notes); all data created with the use of personal data assistants (PDAs), such as iPhones, Blackberries, Droids, Galaxies, Vipers, or similar technology; all data created with the use of document management software; all data created with the use of paper and electronic mail logging and routing software; all Internet and Web-browser-generated history files, caches and "cookies"

David DiBella
Corporate Recruiter
24 SEVEN INC.
August 3, 2018
Page 3

files; and any and all other files generated by users through the use of computers and/or telecommunications, including but not limited to text messages and voice mail.

Please be advised that the obligation to preserve evidence extends to all data, communications and other information stored on any **work or personal computer, smart phone, tablet or cell phone** used by you. The obligation also applies to all communications stored at any web-based e-mail, cloud storage, social networking websites, blogs or instant message service to which you subscribe. **To be clear, your duty to preserve extends not only to email but to any communications or postings made on LinkedIn, Facebook, Snapchat, Instagram or any other social media platform.** We also specifically request that you preserve any video or audio tape that contains any information relevant to the Allegations.

You should immediately suspend any software application, process, practice or procedure that might destroy, purge, erase, delete or alter any document, information or other evidence, including that which is stored electronically, that is or may be relevant to the Allegations. This includes, but is not limited to, any routine process, practice or procedure that might lead to the destruction of such electronic, documentary or other information and/or the deletion, overwriting (automatic or otherwise), reformatting or purging of information stored in electronic formats, such as hard drives, servers, backup tapes, and any other electronic storage devices.

In order to avoid spoliation, you will need to preserve the data requested on the original media. Electronically stored information and the storage media upon which it resides contains relevant, discoverable information beyond that which may be found on printed documents. Therefore, even where a paper copy exists, we will seek all documents in their electronically stored form, along with any information about those documents contained on the media. We will also seek paper printouts of those documents that contain unique information after they were printed out (such as paper documents containing handwriting, signatures, drawings, annotations, highlighting and redactions) along with any paper documents to which no corresponding electronic file exists.

Failure to comply with the duty to preserve all information that may be relevant in the above-referenced matter could result in sanctions, including both monetary and non-monetary sanctions. Thank you for your prompt attention to this matter and please be guided accordingly.

Very truly yours,

Stacey D. Adams

SDA/pnk
Enclosure
cc:     Evan Lupion, Esq. (via email elupion@24seveninc.com)

# EXHIBIT K



Littler Mendelson, P.C.
One Newark Center - 8th Floor
Newark, New Jersey  07102

Stacey D. Adams
973.848.4738 direct
973.848.4700 main
973.741.2314 fax
sdadams@littler.com

August 3, 2018

**VIA E-MAIL (DKENNY@24SEVENINC.COM) AND FEDERAL EXPRESS**

Danielle Kenny
Corporate Recruiter
24 SEVEN INC.
41 Madison Avenue - 37th Floor
New York, New York 10010

**Re:**   **Creative Circle vs. Danielle Kenny, Susan Bortone,**
          **24 Seven and Morgan Stanley Capital Partners**

Dear Ms. Kenny:

This firm represents Creative Circle, LLC ("Creative Circle").  We have recently learned that you are engaged in a deliberate and unlawful effort to recruit Creative Circle employees to leave their employment, breach their contracts with Creative Circle and come work for your current employer, 24 Seven Inc. ("24 Seven").  We are in possession of numerous e-mails and LinkedIn solicitations that you and other 24 Seven employees have sent to Creative Circle employees in what is clearly a concerted act of employee piracy and illegal raiding.  We have previously made 24 Seven aware that these employees have signed "Confidentiality, Non-Solicitation and Non-Competition Agreements" (the "Agreements") with Creative Circle that would prevent them from working for 24 Seven, a direct competitor of Creative Circle.  Indeed, we have proof that you were personally made aware that Creative Circle employees are contractually bound to Creative Circle back in June 2017 – yet you nevertheless continue your efforts to poach these employees.

For the avoidance of any doubt, we attach a copy of Creative Circle's form Confidentiality, Non-Solicitation and Non-Competition Agreement.  Creative Circle employees are required to sign an Agreement substantially in this form.

Inducing Creative Circle employees to breach their Agreements constitutes intentional and tortious interference with contract.  Engaging in a planned campaign of mass recruiting directed at hundreds of Creative Circle employees – knowing full well that these employees are critical to Creative Circle's business and possess invaluable relationships and good will with Creative Circle's candidates and customers – in order to benefit 24 Seven amounts to unfair competition and tortious interference with business relations.  Further, you can be held personally liable for these actions.  Accordingly, Creative Circle hereby demands that you cease and desist from any

Danielle Kenny
Corporate Recruiter
24 SEVEN INC.
August 3, 2018
Page 2

further solicitations of its employees.  If you fail to immediately stop engaging in these unlawful actions, Creative Circle will pursue legal action in Court.

This letter also serves notify you, on behalf of Creative Circle, of your on-going duty to preserve evidence related in any way to: the recruitment or hiring of any Creative Circle employee; all communications between you and any Creative Circle employee, customer or candidate; all communications by or between you and any employee, agent, representative or contractor of 24 Seven concerning hiring and recruitment practices or concerning Creative Circle or any of its employees, customers or candidates; and all communications between you and any employees, agents or representatives of Morgan Stanley Capital Partners (a major investor in 24 Seven) concerning recruitment or hiring practices or strategies, or in any way concerning Creative Circle (collectively, the "Allegations").

You, and all other persons or entities within your control or supervision, or acting on your behalf, are required by law to maintain, preserve and protect any documents, electronically stored information, software and things that you or they know, or reasonably should know, are relevant to the Allegations, or which may lead to the discovery of admissible evidence.  You are hereby given notice not to destroy, conceal or alter any paper documents or electronically stored information – including, but not limited to, all e-mail, text messages, voice mail, instant messages, postings, and messages sent by phone, personal e-mail accounts, or any social networking websites, including but not limited to Twitter, Facebook, LinkedIn, Snapchat, MySpace, Instagram, Tumblr, and blogs, as well as word processing documents and spreadsheet – generated by you and/or stored on your computers, smart phones, and other storage media related in any way to the Allegations.  This obligation extends to, but is not limited to, any electronic, documentary or other information stored in any areas under your control and/or on any computers, computer disks, Zip cartridges, CDs, DVDs, hard drives, servers, back-up media, and/or any other electronic storage devices; email, both sent and received, whether internally or externally; all word processed files, including drafts and revisions; spreadsheets, including drafts and revisions; all databases; all CAD (computer aided design) files, including drafts and revisions; all presentation data or slide shows produced by presentation software (such as Microsoft PowerPoint); all graphs, charts and other data produced by project management software (such as Microsoft Project); all data generated by calendaring, task management and personal information management (PIM) software (such as Microsoft Outlook or Lotus Notes); all data created with the use of personal data assistants (PDAs), such as iPhones, Blackberries, Droids, Galaxies, Vipers, or similar technology; all data created with the use of document management software; all data created with the use of paper and electronic mail logging and routing software; all Internet and Web-browser-generated history files, caches and "cookies" files; and any and all other files generated by users through the use of computers and/or telecommunications, including but not limited to text messages and voice mail.

Danielle Kenny
Corporate Recruiter
24 SEVEN INC.
August 3, 2018
Page 3

Please be advised that the obligation to preserve evidence extends to all data, communications and other information stored on any **work or personal computer, smart phone, tablet or cell phone** used by you. The obligation also applies to all communications stored at any web-based e-mail, cloud storage, social networking websites, blogs or instant message service to which you subscribe. **To be clear, your duty to preserve extends not only to email but to any communications or postings made on LinkedIn, Facebook, Snapchat, Instagram or any other social media platform.** We also specifically request that you preserve any video or audio tape that contains any information relevant to the Allegations.

You should immediately suspend any software application, process, practice or procedure that might destroy, purge, erase, delete or alter any document, information or other evidence, including that which is stored electronically, that is or may be relevant to the Allegations. This includes, but is not limited to, any routine process, practice or procedure that might lead to the destruction of such electronic, documentary or other information and/or the deletion, overwriting (automatic or otherwise), reformatting or purging of information stored in electronic formats, such as hard drives, servers, backup tapes, and any other electronic storage devices.

In order to avoid spoliation, you will need to preserve the data requested on the original media. Electronically stored information and the storage media upon which it resides contains relevant, discoverable information beyond that which may be found on printed documents. Therefore, even where a paper copy exists, we will seek all documents in their electronically stored form, along with any information about those documents contained on the media. We will also seek paper printouts of those documents that contain unique information after they were printed out (such as paper documents containing handwriting, signatures, drawings, annotations, highlighting and redactions) along with any paper documents to which no corresponding electronic file exists.

Failure to comply with the duty to preserve all information that may be relevant in the above-referenced matter could result in sanctions, including both monetary and non-monetary sanctions. Thank you for your prompt attention to this matter and please be guided accordingly.

Very truly yours,

Stacey D. Adams

SDA/pnk
Enclosure
cc:     Evan Lupion, Esq. (via email elupion@24seveninc.com)

# EXHIBIT L

# Morgan Stanley Global Private Equity Completes Investment in 24 Seven

Oct 6, 2016

**New York —**

Investment funds managed by Morgan Stanley Global Private Equity (MSPE) announced today that they have completed an investment in 24 Seven, Inc., one of North America's largest creative and digital human capital management firms. MSPE is partnering with the founder, Celeste Gudas, and the current management team who will remain in place and retain a significant equity stake.

24 Seven is one of North America's preeminent human capital management firms specializing in the placement of freelance and full-time creative, marketing and digital talent. Through a network of nine U.S. offices and two international offices, the company delivers advertising, creative, marketing and interactive / digital professionals for freelance and permanent placements. Clients include a combination of corporate marketing departments and marketing agencies. Morgan Stanley Global Private Equity believes 24 Seven attracts and places high quality talent through a consultative relationship driven approach, and has demonstrated consistently strong growth and increasing profitability.

Adam Shaw, Executive Director of Morgan Stanley Global Private Equity, said, "24 Seven is an exceptional, high-growth player in the attractive creative and digital end market. Morgan Stanley Global Private Equity was uniquely positioned to evaluate the opportunity on a proprietary basis and we, together with the founders, believe Morgan Stanley Global Private Equity is the ideal partner to continue 24 Seven's impressive growth."

Jim Howland, Managing Director and Operating Partner of Morgan Stanley Global Private Equity, added, "We are delighted to partner with 24 Seven. The company's strong brand and dedication to client service have positioned 24 Seven as a leading player in the creative and digital staffing

Case 1:18-cv-07333-PAC   Document 1   Filed 08/14/18   Page 86 of 90

industry. We look forward to supporting management in implementing targeted strategic initiatives to supplement the company's successful track record of achieving outsized growth, continuing to build 24 Seven into one of the nation's leading staffing platforms."

Celeste Gudas, Founder and Chief Executive Officer of 24 Seven, said, "We are excited to partner with Morgan Stanley Global Private Equity and enter a new phase of growth. We are proud of the brand and market presence we have established and expect this new partnership to deliver significant value as we build upon our strong foundation."

This investment is a continuation of Morgan Stanley Global Private Equity's human capital management and business services focus and follows five previous business services sector investments. These include CoAdvantage, a leading PEO that offers small and mid-sized businesses a comprehensive package of outsourced human resources solutions; Creative Circle, a specialized staffing agency representing advertising, creative, marketing, visual communication and digital/interactive professionals; Access Cash, an independent service provider that manages the largest network of ATMs in Canada; EmployBridge, a leading provider of light commercial temporary staffing services in the U.S.; and Zenith, a specialist provider of fleet solutions to corporations in the United Kingdom.

### About Morgan Stanley Global Private Equity

Morgan Stanley Global Private Equity, the middle-market focused private equity business of Morgan Stanley Investment Management, is a leading middle-market private equity platform that has invested capital in a broad spectrum of industries for over two decades. Morgan Stanley Global Private Equity focuses on privately negotiated equity and equity-related investments primarily in North America, as well as Europe and other regions and seeks to create value in portfolio companies primarily through operational improvement. For further information about Morgan Stanley Global Private Equity, please visit www.morganstanley.com.

### About Morgan Stanley Investment Management

Morgan Stanley Investment Management, together with its investment advisory affiliates, has more than 590 investment professionals around the world and $406 billion in assets under management or supervision as of June 30, 2016. Morgan Stanley Investment Management strives to provide outstanding long-term investment performance, service and a comprehensive suite of investment management solutions to a diverse client base, which includes governments, institutions, corporations and individuals worldwide.

### About Morgan Stanley

Morgan Stanley (NYSE: MS) is a leading global financial services firm providing a wide range of investment banking, securities, wealth management and investment management services. With offices in more than 43 countries, the Firm's employees serve clients worldwide including corporations, governments, institutions and individuals. For further information about Morgan Stanley, please visit www.morganstanley.com

Media Relations: Lauren Bellmare, 212.761.5303

**EXHIBIT M**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| **USDC SDNY** | |
| **DOCUMENT** | |
| **ELECTRONICALLY FILED** | |
| **DOC #:** | |
| **DATE FILED:  3/21/16** | |

CREATIVE CIRCLE, LLC,

              Petitioner,

      -against-

DANIEL ECKER,

            Respondent.

For provisional relief in aid of arbitration
pursuant to Federal Arbitration Act, 9 U.S.C.
§ 206.

16 Civ. 01764 (RMB)

**TEMPORARY RESTRAINING ORDER**

     Having been presented to the Court by Littler Mendelson, P.C. (Stacey D. Adams, Esq.,

appearing), attorneys for Petitioner Creative Circle, LLC ("Creative"), on notice to Hoffman &

Associates, 450 Seventh Avenue, Suite 1400, New York, NY 10123 (Andrew Hoffman, Esq.,

appearing), attorneys for Respondent Daniel Ecker ("Respondent"), for a Temporary Restraining

Order Against Respondent Pending Arbitration, and for such other and further relief as the Court

deems just and proper, and the Court having considered Petitioner's Verified Petition for

Injunctive Relief and Memorandum of Law, dated March 8, 2016, in support thereof, along with

the exhibits annexed thereto, and Respondent's Memorandum of Law in Opposition to

Petitioner's application and supporting Affidavit, dated March 14, 2016, and the Court having

heard oral arguments on March 15, 2016, and for good cause shown, it is:

     **ORDERED** that Petitioner's application for Temporary Restraints is hereby granted; and

it is further

     **ORDERED** that Respondent is hereby:

a) restrained from working for Russell Tobin & Associates ("Russell Tobin") at its New
   York City location or at any location within a 50 mile radius of Teaneck, NJ;

b) restrained from working for any other staffing business that competes with Creative Circle within a 50 mile radius of Teaneck, NJ;

c) restrained from competing with Creative Circle's business within a 50 mile radius of Teaneck, NJ, whether on behalf of Russell Tobin or any other competing business;

d) restrained from soliciting, seeking to employ or retaining the services of any employee or independent contractor who worked for Creative Circle within the previous 12 months;

e) restrained from soliciting or seeking to place, directly or indirectly, any temporary employee or independent contractor candidate whom Ecker had directly or indirectly placed or sought to place on behalf of Creative Circle, or whose identity Ecker learned while employed by Creative Circle, or from persuading such candidate to alter or reduce its services for Creative Circle;

f) restrained from soliciting or providing services, directly or indirectly, to any Creative Circle customers whom Ecker serviced or sought to service on behalf of Creative Circle, or whose identity Ecker learned while employed by Creative Circle, or from persuading such customer to alter or reduce its use of services from Creative Circle; and

g) restrained from using or disclosing any of Creative Circle's confidential, proprietary and trade secret information; and it is further

ORDERED that, on or before March 25, 2016, Ecker shall return to counsel for Creative Circle any of Creative Circle's confidential, proprietary or trade secret information, and/or any other Creative Circle property in his possession; and it is further

ORDERED that a conference shall take place on April 4, 2016 at 10:30 a.m. to discuss, among othere things, the submission of witness affidavits and a joint pre-hearing order; and it is further

ORDERED that a Preliminary Injunction hearing shall take place, tentatively, on May 2, 2016 at 9:00 a.m. (unless otherwise adjourned); and it is further

ORDERED that the aforementioned restraints shall remain in effect until the earlier of: (a) this Court's ruling following a preliminary injunction hearing, or (b) the parties' participation in arbitration and the arbitrator renders a decision as to whether or not to extend the aforementioned restraints.

2

**ORDERED** that the parties shall commence arbitration **forthwith,** in accordance with the Employment Agreements, dated June 27, 2011 and June 24, 2015, respectively.

**ORDERED** that Petitioner shall serve a copy of the within Order upon counsel for Respondent within one day of the date of entry hereof.

DATED:   New York, New York
        March 21, 2016

RICHARD M. BERMAN
United States District Judge

3